WILL OF ABRAM EHLE.
ESTATE OF JAMES A. EHLE.

*January 29 — February 19, 1889.*

73     445
59 LRA 655

*Wills: Construction: Limitation of general devise by subsequent clause: Insufficient description of land: Survivorship: Evidence: Burden of proof: Descent.*

1. A testator devised "all of [his] real estate" to his son J. for life, remainder to J.'s three infant children in fee. The will then states that "the land so devised consists of 160 acres" in the town of G., and directs that upon the death of J. it shall be divided into three portions by lines running from north to south, each portion containing 53⅓ acres, and that the western third, embracing the buildings, shall belong to A., one of said children, and the other two thirds shall belong to the other two children respectively. The testator died seized of 260 acres of land in a compact form, 240 rods in length and 173⅓ rods in width. *Held:*

    (1) Even if there was a sufficient description of the 160 acres to be divided, the devise of *all* the testator's real estate was not limited to that amount by the later clause of the will. The 100 acres not to be divided would go to the infant devisees as tenants in common.

    (2) It being impossible to determine from the will the exact location of the 160 acres to be divided, the direction as to division is void for uncertainty.

2. The testator, his son J., and the wife and three infant children of the latter perished in a fire which consumed the testator's house. The evidence (fully stated in the opinion), showing the arrangement of the house, the probable origin of the fire, the location of

the bodies when found, etc., is *held* to sustain the findings of the circuit court that the testator died first and that J. died before his wife or either of the three children. The title to the testator's real estate therefore vested, under the will, in the three children, and its descent must be traced from them. If the mother survived them, the land descended to her and, upon her death, to her parents, under subd. 2, sec. 2270, R. S.; but if the children, or any of them, survived their mother the land descended to their next of kin (in this case their mother's parents aforesaid) under subd. 4 of that section. The personal estate of J. also passed to and through his widow and children.

3. In such case those claiming the real estate by descent from J., on the ground that it descended to him from his children, had the burden of showing that he survived such children. But those claiming the personal property of J. under and through his widow and children had the burden of showing that they or some of them survived him.

APPEALS from the Circuit Court for *Sheboygan* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

August 31, 1881, Abram Ehle made his last will and testament, the essential portions of which to be here considered are as follows:

"I give and devise to my wife, Susan Ehle, all of my real estate for the term of her natural life, with reversion at her death to my son James for the term of his natural life, and at his death said real estate shall revert to and become the property of his three children, namely Abram T., Flora, and Mary, absolutely. The land so devised consists of 160 acres, all in Greenbush, county of Sheboygan; and at decease of my son James shall be divided into three (3) portions, by lines running from north to south, each embracing fifty-three and one-third acres, or thereabouts; but the western third, of fifty-three and one-third acres, embracing the residence and farm buildings, shall become the property of my grandson aforesaid, Abram T., the other two thirds, respectively, becoming the property of my two

grandchildren, Flora and Mary, respectively; it being understood, and my will, that Flora, aforesaid, shall possess the east third, and Mary, her sister, the middle third; . . provided, also, that in case of the death of either of the three (3) grandchildren, reversioners above specified, who shall die before arriving at his or her legal majority, then the reversion to that individual minor shall be divided and become the property of the other two beneficiaries in equal proportion, and in case of the death of a second reversioner the survivor shall take the whole. Also I will and direct that my gold-headed cane shall be the property of my son James for the term of his natural life, with reversion at his decease to my grandson, Abram T., aforesaid. Then I give and bequeath to my son, James Ehle, all the goods and chattels in my possession, absolutely."

April 20, 1885, Susan Ehle, mentioned in the will, died. The said Abram Ehle, and the said James A. Ehle, mentioned in said will, and his three infant children, to wit, Abram T., Flora, and Mary, mentioned in said will, and their mother, Helen Ehle, the wife of the said James, were each and all burned to death on the morning of February 16, 1886, at the house of said Abram Ehle, in which they all resided, in the town of Greenbush, Sheboygan county. Thereupon said will was admitted to probate in the county court of that county.

From the judgment and assignment of said estates, entered in said matters respectively in said county court, the blood relatives and heirs at law of said Abram and James appealed to the circuit court; and thereupon the jury was waived therein, and the cause was tried by said circuit court; and, upon the trial thereof therein, the court found, in relation to the estate of said Abram, in addition to the facts stated, in effect, that said Abram survived his wife, Susan, mentioned in the will; that said James was the only child of said Abram; that said infants, Flora,

Abram T., and Mary, were the only children of said James and grandchildren of said Abram; that said Helen was the mother of said infant children, and the wife of said James; that, of the persons above named at said burning, the said Abram died first in order of time, and the said James next, and the said infant children, with their said mother, died last; that *John W.* and *Caroline Taylor* are the maternal grandparents and only heirs at law surviving said three infant children; that said *John W. Taylor* is the only duly qualified administrator of the estates of said three infant children; that by said will the said Abram bequeathed and devised all of his estate to said three infant children, subject to the life interest therein in favor of their said father, the said James.

As conclusions of law therefrom, the court found, in relation to said Abram's estate, in effect, that under said will all of the estate of said Abram vested in said three infant children, in their life-time, as devisees and legatees; that, by the death of all of said infant children all of such estate vested in said *John W.* and *Caroline Taylor* as heirs at law of said infant children, and in said *John W. Taylor* as administrator of the estates of said grandchildren; that the judgment and order of the county court therein, assigning all of the real estate left by said Abram to the said *John W.* and *Caroline Taylor* as heirs at law of said infant children, and all of the residue of the personal property left by said Abram to the said *John W. Taylor* as administrator of the estates of said infant children, be, and the same was thereby, affirmed; that the costs of the respective parties be taxed therein, and constitute a charge upon said estate, and be paid out of the same; and ordered judgment accordingly. From the judgment entered thereon accordingly the blood heirs of said Abram and the said James, respectively, have appealed.

In addition to the facts stated, the court, in relation to

the estate of said James, found, in effect, that said infant children and their mother all survived the said James; that all of the estate left by said James upon his death vested in said infant children, in their life-time, as his heirs at law; that by the death of said infant children, and by the appointment of said *John W. Taylor* as administrator of their estates, all of the residue of said estate of said James A. vested in said *John W. Taylor* as such administrator; that the judgment and order of the county court entered therein, assigning all of such residue, after paying all expenses of administration, to said *John W. Taylor* as administrator, be, and the same was thereby, affirmed; that the costs of the respective parties therein be taxed therein, and be and constitute a charge upon said estate, and be paid therefrom; and ordered judgment accordingly. From the judgment entered thereon accordingly the blood heirs of said James have appealed.

*Geo. P. Knowles,* for the appellants, to the point that where there is an irreconcilable repugnancy between two clauses of a will the latter clause must prevail as being the latest expression of the testator's intention, cited *Heidlebaugh v. Wagner,* 72 Iowa, 601; *Vaughan v. Cator,* 85 Tenn. 302; *Baker and Wheeler's Appeal,* 115 Pa. St. 590; *Christy v. Badger,* 72 Iowa, 581; *Hoppock v. Tucker,* 59 N. Y. 202; *Van Nostrand v. Moore,* 52 id. 12; *Freeman v. Coit,* 96 id. 63; *Pratt v. Rice,* 7 Cush. 209.

For the respondents there was a brief by *Seaman & Williams,* and oral argument by *W. H. Seaman.*

CASSODAY, J.   The testator, Abram Ehle, died seized of 260 acres of land, consisting of six forties, and a narrow strip of twenty acres on the west side thereof, all in compact form, and being 240 rods in length, north and south, and 173⅓ rods in width, east and west.

1. It is claimed that the will only covers 160 acres of

such lands; and that as to the other 100 acres the testator died intestate; and hence that the same, upon the death of Abram, descended to James; and then, upon his survival of his wife and children, and his death, descended to his heirs at law, who in that event would have been the same as the heirs at law of Abram. The determination of the question may have some bearing upon the burden of proof in connection with the more important question of survivorship which will be considered hereafter. Undoubtedly the learned counsel for the appellants is correct in claiming " that the plain intent of the testator, as evinced by the language of his will, must prevail." It is moreover true that such intention must be collected from the whole will; that in construing it the different parts are to be examined and compared, with the view of ascertaining such intention as evinced by the whole will and not as may appear from some particular part when taken alone. *Baddeley v. Leppingwell,* 3 Burrows, 1542; *Will of Rowse,* Lofft, 99; *Lane v. Vick,* 3 How. 472; *Hopkins v. Glunt,* 111 Pa. St. 290. By the first clause of the will the testator disposed of " *all* " of his real estate to his three grandchildren " *absolutely,*" subject, however, to the two intervening life estates, — one of which had been extinguished by the death of Susan Ehle prior to the death of the testator. Standing alone, the language of that clause of the will would be too plain for construction. But it is claimed that such clause is immediately followed by another, which is either repugnant to the first, or necessarily restricts its meaning to a particular 160 acres. If such is the plain meaning of that clause, then it must prevail over the first clause, in accordance with a rule well understood and supported by authorities cited by counsel. The clause referred to is to the effect that " the land so devised consists of 160 acres," to " be divided into three portions, by lines running from north to south, each embracing fifty-three and one-third acres or thereabouts,"

JANUARY TERM, 1889.                451

Will of Abram Ehle.    Estate of James A. Ehle.

with "the residence and buildings" on the western third. Assuming, for the present, that the description of such 160 acres is sufficiently definite and certain to be located, still we would not be justified in holding that the second clause is repugnant to the first. On the contrary, the second clause, upon such assumption, merely devised such 160 acres in three equal specific parts to the respective grandchildren, leaving the other 100 acres to go to them as tenants in common. This is in harmony with the rule that where the whole will indicates nothing to the contrary a devise by words of general description is not to be cut down or limited by a subsequent attempt at a particular description. *Freeman v. Coit*, 96 N. Y. 68; Schouler on Wills, § 475. So it is in harmony with the rule that no presumption of an intent to die intestate as to any part of the estate is to be indulged, when the words of the will, fairly construed, are such as to carry the whole. *Raudenbach's Appeal*, 87 Pa. St. 51; *Ferry's Appeal*, 102 Pa. St. 207; *Given v. Hilton*, 95 U. S. 591; Schouler on Wills, § 490.

2. But we are not prepared to hold that the description of the 160 acres, attempted in the second clause of the will, is sufficiently definite and certain to be supported. True, it is to be divided by north and south lines into three equal parts, and the western third is to embrace the residence and farm buildings. Neither the length nor the breadth of such parts, however, are given. They may be the whole length of the farm,— 240 rods,— or less than 148 rods, or at any point between those distances. Of course, the width would increase as the length diminished. If we understood counsel correctly as to the location of the buildings, and we assume that the lengths of such strips were calculated to extend the whole length of the farm, then it is very plain that the west line of such 160 acres might be the west line of the whole farm, or the 160 acres might be moved gradually eastward, until such west

line struck such residence or farm buildings; and yet the western third would all the time answer the calls of such description. The same would be true, in a more limited sense, in case such strips only extended to the quarter line, or any point between that line and the south line of the farm. Thus it appears that the farm embraced an infinite number of 160-acre tracts, each of which would answer all the calls of the description given. We must hold that such attempted description of 160 acres is void for uncertainty.

3. This brings us to the important question of fact, whether the testator, Abram Ehle, and his son, James A. Ehle, or either of them, survived all three of the infant children. The determination of the question depends upon inferences and conclusions to be drawn from facts and circumstances in evidence and which are substantially undisputed, and the rules of law applicable as to the burden of proof. To enable us the better to educe such inferences and conclusions in the light of the legal principles applicable, it seems to be necessary to briefly state the situation on the night of this horrible disaster.

The house consumed was a wooden structure, and had been built about thirty-three years. The main part was two stories high, thirty-four feet long and twenty-four feet wide, with a cellar under the whole, and the front end facing the north. In the west third of this main part there was a front and back hall leading from the front door south to the kitchen in an addition or extension. Near the front door, and opposite the foot of the stairway leading above, was a door leading eastward into the front room, which was about eighteen feet long and sixteen feet wide. Immediately south of this front room was the family room, of about sixteen feet square, with two beds in it, in which James and his wife and three children slept. One of the beds in that room stood in the southwest corner, and was

usually occupied by Helen and her two little girls. The other bed stood near it, and was usually occupied by James and his little boy. The heads of both beds were against the south wall of that room. On the north side of that room, and near the middle, was a chimney, running from the bottom of the cellar through the top of the roof. On the east side of this chimney was a door between this room and the front room. Near the chimney was a stove, with a zinc or iron sheet under it, and the pipe going into the east side of the chimney, in which fire was kept when the weather was very cold. There was also a stove in the cellar, with a pipe running into the chimney below, in which fire was sometimes kept in very cold weather. In the hall, and on the projected line of the partition between the front room and the family room, was a door between the front and back halls above mentioned. On the east side of the south end of this back hall was a door leading south into the kitchen. This kitchen comprised the north two-thirds of a one-story addition to, or extension of, the main building; being thirty feet long north and south, and twenty feet wide east and west, and the west line of which was on the west line of the main building projected south. In the south third of this extension there were two bedrooms,— the one on the east being occupied by a Mrs. Kinney, with a door from it opening into the kitchen, and the one on the west by the young man mentioned below, with a door from it opening into the kitchen, and a window on the west side of it looking into the wood-shed. This wood-shed extended along the whole west side of the extension mentioned, and about five or six feet further north along the west side of the main building. At the southwest corner of this back hall there was a window looking into this wood-shed.

On either side of the main building there was a wing extending north to within two or three feet of the front of the

main building.   The west of these wings was eighteen feet wide east and west, and twenty-six feet long north and south, occupied by Abram, who was at the time nearly eighty-two years of age.   On the north end of that room there were two windows and a door, and one window on the west side.   In the northwest corner of this room was a bureau upon which a kerosene lamp was kept burning all night.   On the east side of the room, and a foot or two south of the partition line between the front and family rooms and the front and back halls projected, there was a stove in which wood fires were kept all night.   The pipe from this stove passed up and through the partition into the back hall, and from thence through the partition into the family room, and from thence into the chimney described. This stove seems to have been an old one, and occasionally when the fire would fall down the door would fly open and coals come out upon the floor.   A little south of the stove there was a door leading from this room occupied by Abram into the back hall, and across that hall in a southeasterly direction was a door leading into the room at the foot of the bed usually occupied by Helen and her two little girls. These doors were frequently left open, so that James and his wife might answer the calls of Abram, who was in poor health, and quite feeble, and required considerable attention.   Helen was quite active and nervous, and easily awakened.   James had a phlegmatic temperament, and it was at times difficult to wake him up.   In very cold weather it was difficult to keep Abram warm, and consequently at such times his fire required much attention, and the door between his room and the back hall was usually kept shut. This was done by James or Helen, but the more frequently by Helen, as she was awakened more easily.

   The old gentleman slept in a bed in the southwest corner of his room, with the head to the west.   On the back or south side of his bed was a window looking out into the

wood-shed.   At the foot of his bed was a door leading from
his room into the wood-shed, but which was kept closed in
cold weather.   In the southeast corner of his room, and
next to the back hall, and just by the side of the window
from the back hall into the wood-shed, there was a closet in
which the old gentleman kept some of his clothing, medi-
cine, pain-killer, liquors, and other things.   There was no
door to this closet, but calico curtains were hung up in front
of it.   He kept a candle therein, with snuffers, and matches
to light it.   The old gentleman was in the habit of going
to this closet, and lighting the candle, and getting medi-
cines or liquors in the night.   After the fire his body was
found in the ruins beneath where this closet was, with a
candlestick and snuffers near.

No one escaped from the burning house except the young
man.   He had been to a neighbor's the evening before,
and returned about half past ten.   There was at that time
a light in the old gentleman's room, but none in the kitchen.
All had apparently gone to bed.   He came through the
wood-shed into the kitchen, and locked the kitchen door.
Without striking any light, he passed from the kitchen into
his bedroom at the southwest corner of the kitchen, and
shut the door, and went to bed with his shirt, drawers, and
stockings on.   After sleeping for some hours, he was awak-
ened by the barking of the dog in the wood-shed.   He first
noticed smoke in the room.   He jumped up, opened the
door into the kitchen, and saw red light and flames therein.
The flames from the kitchen struck him in the face, and
burned his hair.   At the same time he heard the cry of
James from the more remote portion of the kitchen directly
in front of him, but did not see him, and neither saw nor
heard any one else.   He jumped back, and then through
the window, without lifting it, into the woodshed.   He
reached back through the window for his trunk, just be-
neath, but the fire was so intense as to compel him to desist.

It was very cold — ten or twelve degrees below zero. He
had nothing on but the night-clothes mentioned. He could
see through the window back of the old gentleman's bed
that his room was all on fire. The west side of the kitchen
and on the south side of the old gentleman's room was on
fire. The fire was then, as it appeared to him, strongest
in the window opening into the wood-shed from the back
hall, and in that corner between the old gentleman's room
and the kitchen. As he went from the wood-shed around
the west side of the house to the front, he saw that fire had
broken through and was coming out of the west window of
the old gentleman's room and then going up toward the
top of the house. The front part of the main building was
all on fire, and the main part was burning stronger than
the west wing. The wind was blowing hard from the
northwest — a little more from the west than the north.
He then went to the barn, and saw that the roof of the
main part south of the chimney was all on fire and crack-
ing. He then went to Rosenthal's, about eighty rods dis-
tant. He got there about 4 o'clock in the morning. After
the fire the bodies of Helen and her three little children
were found together in the ruins near the window, beneath
the southeast corner of their family sleeping room. The
body of Mrs. Kinney was in the ruins near the window,
beneath the northeast corner of the kitchen. The body of
James was found in the ruins beneath a point about six
feet south of the door leading from the back hall into the
kitchen, and near the east wall of the stairway leading
from the kitchen to the cellar under the main building;
and at or near such body were found the remains of his
watch that he was in the habit of carrying in his vest-pocket,
marking time at about 20 minutes of 3, his knife that he
was in the habit of carrying in his pants-pocket, and the
buckles from his suspenders and overshoes. Perhaps the
buckles from the overshoes might be otherwise accounted

for, but the other things pretty clearly indicate that James was dressed at the time of his death.    It is stipulated as a fact in the case, in effect, that death would result quicker from excessive heat than from smoke.

The facts and circumstances thus summarily given induce the conviction that the fire originated in the room occupied by the old gentleman, either by the falling of coals from his stove, or more probably by the curtains taking fire from the lighted candle in his hand, while helping himself to medicine or liquor in the closet.    The fact that his body was found in the ruins beneath this closet is a very strong circumstance in favor of this latter supposition. Besides, the young man asserts, in effect, that the fire in that corner — in the back hall, between that closet and the kitchen — seemed to be the strongest when he first went out into the wood-shed; that the old gentleman's room was full of fire and that the windows had broken through, and that the wind was blowing very strong from the northwest.    Assuming that the fire thus originated in the old gentleman's room, such a wind would naturally blow it through his door, into the back hall, and from thence through the door into the kitchen, which was substantially the condition of things disclosed by the evidence upon such first discovery.    So it would naturally blow from the back hall through the door into the family sleeping-room.    But had the fire originated in the family room, with the wind blowing hard from the northwest, as it did, the fire would naturally have been more advanced and intense in that part of the house, and less advanced and intense in the vicinity of the old gentleman's room and closet, the back hall, and the part of the kitchen adjoining, than appeared upon such first discovery.    The inevitable conclusion from all the evidence is that the fire originated in the old gentleman's room, and that he expired before any other person in the house.    Such was, in effect, the finding of the trial court.

4. This being so, it necessarily follows, as already indicated, that immediately upon his death the title to the real estate, under the will, became vested in the three infant children absolutely, subject only to the life estate of their father, James.   And it follows, as a necessary corollary to this proposition, that those who claim any part of such real estate by descent from such children (subd. 2, sec. 2270, R. S.) under James, have the burden of proving that he survived the death of each and all of those children. *Newell v. Nichols*, 75 N. Y. 78; *Fuller v. Linzee*, 135 Mass. 468.   The case certainly presents no preponderance of evidence in favor of such survivorship of James.   In the absence of such preponderance of evidence, we are compelled to hold that such life estate of James became extinguished by his death prior to the death of all of the three children, and that upon the death of all three of them the lands descended to their mother, if living; and then, in that case, upon her death, which must have immediately 'followed, to her parents, *John W.* and *Caroline Taylor*, under subd. 2, sec. 2270, R. S.; but in case said children or any of them survived their mother, then said lands descended to their "next of kin, in equal degree," under subd. 4 of the same section. *Estate of Kirkendall*, 43 Wis. 167; *Ryan v. Andrews*, 21 Mich. 229.   As both paternal grandparents had previously died, it is obvious that such "next of kin" were their maternal grandparents, to wit, the said *John W.* and *Caroline Taylor*. *Ibid.*   Such maternal grandparents were next of kin to said infant children in the second degree, whereas their next of kin on their father's side were in a much more remote degree.   2 Bl. Comm. 203.   Such were, in effect, the conclusions of the trial court.

5. The succession to the personal estate of which Abram Ehle died seized is a more difficult and delicate question. By the will he bequeathed such personal estate to his son James absolutely.   James, therefore, died seized of such

personal estate, as well as any property owned by him in his own right.   Under the statutes, all of the property of which he so died seized, on his death descended to such of his children and widow as might be living at the time of his death.   Secs. 2270, 3935, R. S.   If none of them survived him, however, then the same descended " to his next of kin, in equal degree," as prescribed in those sections; for in that event he would " have no lawful issue, widow, father, mother, brother, nor sister."   Subd. 4, sec. 2270, R. S.   The burden, therefore, of proving that the widow and children, or some of them, survived James, rested upon those claiming under and through such widow and children.   *Newell v. Nichols*, 75 N. Y. 78; *Fuller v. Linzee*, 135 Mass. 468. The learned counsel for the appellants strenuously insists, not only that there is no preponderance of evidence in favor of such survivorship, but that such preponderance is really the other way.   The evidence most relied upon in support of this contention is the fact that at the time the young man opened his door into the kitchen, and the flames struck him in the face, he heard the cry of James in the flames some ten or twelve feet in front of him; but he did not see him, and heard no other person then, nor at all.   Had James at the time been in the family room with his wife and children, and perished there with them, and his voice had been recognized as emanating from that room, without hearing any other utterance, then there would have been much force in the argument.   The case most relied upon in support of such contention was, in principle, similar to the case just supposed.   *Pell v. Ball*, 1 Cheves Eq. 99. But that adjudication, as well as the weight of the authorities and reason, is to the effect that where the death of two or more persons results from a common disaster *the case must be determined upon its own peculiar facts and circumstances, whenever the evidence is sufficient to support a finding of such survivorship;* but in the absence of any such

evidence the question of such survivorship must necessarily be regarded as unascertainable, and hence, in such case, the rights of property must be determined as if death occurred to all at the same moment of time. *Newell v. Nichols*, 75 N. Y. 78; *Wing v. Angrave*, 8 H. L. Cas. 183; *Russell v. Hallett*, 23 Kan. 276; 3 Whart. & S. Med. Jur. § 734; *Coye v. Leach*, 41 Am. Dec. 523–525, notes; *Rhodes v. Rhodes*, L. R. 36 Ch. Div. 586, cited in *Whiteley v. Equitable L. A. Society*, 72 Wis. 176.

We are therefore called upon to inquire whether there is any evidence to support the finding that the children and their mother survived the death of James. If the cry of James was evidence that he survived any one, aside from his father, there would be more plausibility in saying it was Mrs. Kinney, as both of their bodies were found beneath the ruins of the same room. Her bedroom was more remote from the place of the origin of the fire than any one in the house. The young man was manifestly in no more danger in his room than she was in hers, if as much. But he heard no cry from her, notwithstanding the door of her room was but a few feet from his. At the time he looked into the kitchen the fire in the northwest corner of that room, where the body of James was found, must have been much more intense than near her bedroom, or in the northeast corner of the kitchen, where her body was found. This being so, we would naturally suppose that she would have made some outcry at the time the young man looked into the kitchen, if she was then in that room. From her situation, and all the circumstances, it may fairly be inferred that she became suffocated without much exclamation, or else that she did not leave her room until after the young man had escaped into the woodshed, and when the circumstances were more unfavorable to his hearing such cry from her or any of the remaining victims.

But there are other circumstances strongly against the

contention of the appellants.  It is established by uncontradicted evidence that James was enveloped by intense flames at the time of the utterance of the cry, and hence he must have expired within a few seconds thereafter.  There is no evidence as to whether the door leading from the back hall into the room occupied by the children and their mother was open so as to admit the fire prior to such cry, unless it be inferred from the fact that James is supposed to have slept in his bed that night as usual, and must have passed out into the back hall before being enveloped in flames.  He manifestly had his pants and vest on when he expired.  Whether he put them on just before leaving his sleeping-room, or had worn them all night in consequence of the severity of the cold, which necessitated more frequent attention to his father's fires, is a mere matter of conjecture.  So, whether he shut the door when he passed out of his sleeping-room, or left it open, or whether the fire had got into that back hall before he passed into it, or whether the door between his father's room and that back hall was open or shut when he passed from his sleeping-room into that hall, are mere matters of conjecture.  It may be fairly inferred that at the time he left his sleeping-room there was no fire in it or visible from it; otherwise he would have attempted to rescue his wife and children.  So it may be fairly inferred that he left that room either in answer to a recognized cry or to supply a supposed want of his father, and that the fire entered the back hall after he got into it, either by his opening the door into his father's room or in some other way.  The only other hypothesis is that he had been absent from his sleeping-room for some little time before the fire.

Another circumstance tends to prove that the fire did not penetrate the family sleeping-room until some time after James had left it, and that is the fact that his wife succeeded in taking the three children from their beds to a

point near their east window, where they were manifestly overtaken by the flames, or suffocated by the smoke, and expired together.  The direct evidence, therefore, establishes the fact that James uttered the cry under circumstances which made death certain to him within a few seconds; whereas, there is no evidence that at that same moment of time the flames had penetrated the family sleeping-room,— much less that at that same moment death was equally imminent to the children and their mother.  It is not the case of death to several from the same direct operating cause, as an explosion; nor yet the case of several burning to death in the same room, or in the same building, in the absence of all evidence tending to show the situation of the victims and the place of the origin and the progress of the fire.  On the contrary the death of the several victims resulted from a succession of causes.  The probable location of the several members of the household is established beyond controversy.  The building covered quite a large space of ground.  That the fire originated in the northwest wing of the building, and took the life of the old gentleman as its first victim, is ascertained to a moral certainty.  That the fire was gradually pushed from that room towards the southeast corner of the southern extension of the house by a very strong wind from the northwest is pretty clearly established.  That such progress was more or less obstructed by partition walls, ceilings, and doors is equally certain.  That such fire naturally, and therefore probably, first advanced from the old gentleman's room into the back hall seems to be morally certain.  That James first met the fire in that hall, or at or near the door between it and the kitchen, seems to be an inevitable conclusion from all the evidence.  That the children and their mother were not reached by the fire until a subsequent stage in its progress seems probable from the construction of the building and the direction of the wind; and there is no affirmative evi-

dence to overcome such probability.   Such being the evidence, we are forced to the conclusion that the finding of the court, to the effect that the three children and their mother all survived the death of James A. Ehle, is sustained by the evidence.

*By the Court.*— Each and both of the judgments of the circuit court are affirmed.   In pursuance of the stipulation of the parties on file, the costs and disbursements of both parties herein are ordered to be paid out of the estates in the hands of the administrator.