## BURNET, COMMISSIONER OF INTERNAL REVENUE, v. HOUSTON.

No. 199.   Argued March 12, 1931.—Decided April 13, 1931.

*Assistant Attorney General Youngquist,* with whom *Solicitor General Thacher* and *Messrs. Sewall Key* and *A. H. Conner,* Special Assistants to the Attorney General, *Erwin N. Griswold,* and *Clarence M. Charest,* General Counsel, and *Allin H. Pierce,* Special Attorney, Bureau of Internal Revenue, were on the brief, for petitioner.

*Mr. William Clarke Mason*, with whom *Mr. John Russell, Jr.*, was on the brief, for respondent.

*Messrs. James Craig Peacock* and *Gerald Ronon*, by special leave of Court, filed a brief as *amici curiae*.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The question in this case arises under § 214 (a) of the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1066, 1067, the pertinent part of which is as follows:

" Sec. 214 (a). That in computing net income there shall be allowed as deductions:

.          .          .          .          .

"(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, . . ."

The respondent, in making his tax return for 1920, claimed a loss incurred in a transaction entered into in the year 1906, by which he acquired certain rights of the character, and in the manner, hereafter stated. The Commissioner of Internal Revenue disallowed the claim, and his determination was sustained by the Board of Tax Appeals upon the ground that the taxpayer had failed to show the value of the rights as of March 1, 1913. 13 B. T. A. 279. Upon a petition for review the Circuit Court of Appeals upheld the claim and reversed the action of the Board of Tax Appeals. 39 F. (2d) 351.

The following are the facts: In 1906, owing to excessive loans made to Adolph Segal, the Real Estate Trust Company of Philadelphia closed its doors, and a receiver was appointed. Segal had deposited collateral, which possessed an " uncertain value " and could not readily be liquidated. A plan of reorganization was proposed by the receiver, which, among other things, contemplated the creation of a fund of $2,500,000 to be subscribed by direc-

tors of the company to guarantee a value of $3,000,000 for the Segal collateral—designated in the plan, "Segal matters." The subscribers to the fund were to receive any excess over the amount of $3,000,000 which might be realized from the administration of the " Segal matters." No limit of time was put upon the administration, or upon the final disposition, of the assets embraced by the " Segal matters." The plan became effective and the company resumed business on November 1, 1906; and thereafter, and until December 30, 1920, the " Segal matters" were administered under the exclusive direction of the president of the company, who theretofore had been the receiver.

The respondent, a director of the company, was a subscriber to the fund in the sum of $305,000. At the time of the subscription respondent believed that the " Segal matters " had a potential value which could be converted into a sum sufficient to repay the subscribers the amount of their subscriptions with interest, and possibly some profit. The president, then receiver, expressed to the directors the same belief.

Included in the Segal collateral were certain bonds and shares of stock of the Pennsylvania Sugar Refining Company. At the time the subscriptions to the guarantee fund were made, there was in contemplation the bringing of a suit in behalf of that company against the American Sugar Refining Company under the Sherman Antitrust Act; and the value of the " Segal matters " depended to some extent upon the successful prosecution of this suit. In fact, two suits were brought, one in a federal district court for $10,000,000, and another in a state court, the latter on the ground that an agent of the American Sugar Refining Company had made an agreement in restraint of trade with Segal. The litigation was compromised in January, 1910, upon the delivery to the Real Estate Trust Company by the American Sugar Refining Company of certain bonds, among which were bonds of the Pennsyl-

vania Sugar Refining Company. In 1912, the latter were converted into 7,268 shares of stock in a reorganization called Pennsylvania Sugar Company. Some question having arisen in respect of the rights of the subscribers, on May 5, 1916, a supplemental agreement was made to the effect that when the 7,268 shares of stock in the Pennsylvania Sugar Company were disposed of, the contributors to the guarantee fund should receive one-fourth of the proceeds. These shares, at that time and for a period prior thereto, constituted the principal unliquidated assets of the original " Segal matters."

In 1920, the parties concerned having concluded that the remaining Segal assets would not soon increase in value, the subscribers entered into agreements providing for complete liquidation of the " Segal matters," and, thereupon, for the distribution of one-fourth of the Pennsylvania Sugar Company stock to the subscribers in proportion respectively to the amounts of their subscriptions, in full satisfaction of all agreements relating thereto. Respondent, accordingly, received 222 shares of Pennsylvania Sugar Company stock, the fair market value of which was $150 per share. Upon that basis, respondent, in 1920, wrote off his books a loss of $271,700, a sum arrived at by deducting $33,300, the value of the stock received, from $305,000, the amount of his original subscription. In his return for 1920 the amount was deducted as a loss.

We assume, for the purposes of the case, that, within the meaning of § 214 (a) (5), the facts establish a transaction entered into for profit by the subscribers to the fund of $2,500,000. In this view each subscriber acquired an interest in the amount which might be realized in excess of $3,000,000 by the administration and disposition of the " Segal matters." Such an interest falls within the meaning of the term " property." See *Townsend* v. *Ashepoo*

*Fertilizer Co.*, 212 Fed. 97, 101; *Samet* v. *Farmer's & Merchants' Nat. Bank*, 247 Fed. 669, 671; *Presbrey* v. *Simpson*, 290 Fed. 333, 335. Tested alone by the fact that the cost to respondent in 1906 of his portion of this interest was $305,000, and the fact that by the final settlement of 1920 he received only the sum of $33,300, the result was an actual loss to the extent of the sum claimed. But this is not enough. Section 202 (a) of the Revenue Act of 1918, *supra*, provides:

" That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—

"(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; . . ."

Under this provision, it is necessary to consider not only the cost of the interest acquired by respondent in 1906 but also its fair market price or value as of March 1, 1913; and whichever of these is found to be the lower must be taken as the basis for determining the loss resulting from the final disposition of the property. In other words, the effect of the provision in respect of value on March 1, 1913, is to limit the deductible loss by that value if it be less than the original cost. This is the effect of the prior decisions of this court. *United States* v. *Flannery*, 268 U. S. 98, 103, and cases cited; *Heiner* v. *Tindle*, 276 U. S. 582, 587. And see *Nichols* v. *Smith*, 35 F. (2d) 938, 939; *Bloch* v. *Commissioner*, 16 B. T. A. 425, affirmed, 42 F. (2d) 1013.

The burden of proof to establish a deductible loss and the amount of it, clearly, was upon the respondent. *Reinecke* v. *Spalding*, 280 U. S. 227, 233; *United States* v. *Anderson*, 269 U. S. 422, 443. It was just as necessary under the statute for the respondent to prove value as of March 1, 1913, as it was to prove cost in 1906 and the

amount finally received by him in 1920. The court below, after a review of the facts, disposed of the matter by saying:

" To determine, in view of these variable factors, or lack of factors, its true or approximate value on a given date, as that of March 1, 1913, selected by the commissioner as the basis of the tax calculation, was a sheer impossibility. The only fixed factors in the situation were those of cost in 1906 and return in 1920. It follows that the proper basis for measuring the petitioner's admitted loss—because the only possible basis—was that of cost and return."

We cannot agree that the impossibility of establishing a specific fact, made essential by the statute as a prerequisite to the allowance of a loss, justifies a decision for the taxpayer based upon a consideration only of the remaining factors which the statute contemplates. The definite requirement of § 202 (a) (1) of the act is not thus easily to be put aside. The impossibility of proving a material fact upon which the right to relief depends, simply leaves the claimant upon whom the burden rests with an unenforcible claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof. Compare *Underwood* v. *Wing,* 4 De Gex, M. & G. 632, 660; *Newell* v. *Nichols,* 75 N. Y. 78, 90; *Estate of Ehle,* 73 Wis. 445, 459–460; 41 N. W. 627; 2 Chamberlayne, Modern Law of Evidence, § 970.

Neither can the presumption be indulged that the *cost* of respondent's interest in 1906 was the *value* of that interest in 1913, for *non constat* that such cost was the value even in 1906.

Moreover, we think the record is far from demonstrating the impossibility of supplying evidence from which the required fact might be found. The 7,268 shares of stock in the Pennsylvania Sugar Company, the distribution of which in 1920 closed the transaction, had been received by the Real Estate Trust Company as early as 1912. This

stock, together with certain bonds, not otherwise described, constituted on March 1, 1913, the entire available assets remaining of the original " Segal matters." There seems to have been no difficulty in ascertaining the value of the stock in 1920; and it is hard to see why its value, as well as the value of the bonds, could not have been, at least approximately, determined as of March 1, 1913, and, consequently, the approximate value of the contingent interest of each of the subscribers to the fund ascertained as of that date. No reason is suggested by the record or otherwise, and none occurs to us, for not seeking light on the subject from those who had been in charge of the liquidation of the " Segal matters." We cannot assume that such an effort would have been fruitless. Respondent was bound to produce the best available evidence of value which the circumstances and nature of the transaction permitted. It does not appear that he made any attempt to do so.

*Judgment reversed.*