## SIOUX CITY STOCK YARDS CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9346.

Circuit Court of Appeals, Eighth Circuit.

June 20, 1932.

STONE, Circuit Judge, dissenting.

Robert A. Littleton, of Washington, D. C. (Mason, Spalding & McAtee, of Washington, D. C., on the brief), for petitioner.

Andrew D. Sharpe, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and John D. Foley, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before STONE, KENYON, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge.

This is a petition to review a decision of the United States Board of Tax Appeals assessing excess profit taxes against petitioner for the years 1918, 1919, and 1920.

Petitioner is a corporation organized under the laws of the state of Iowa, with an authorized capital stock of $3,000,000, divided equally between preferred and common stock. It was organized for the purpose of acquiring, owning, and operating a stockyard at Sioux City, Iowa. Its income has been derived from charges for unloading, yarding, and feeding live stock shipped to its yards, and from rentals of office space and other facilities. It has not engaged in the business of buying or selling live stock, and its business success has depended mainly upon its ability to maintain a competitive market for live stock of such character as would cause stock raisers and shippers to deal at its market. Its predecessor, Union Stock Yards Company, had failed because of its inability to establish such a live stock market.

After acquiring certain stockyard facilities at Sioux City, Iowa, it undertook to establish a market such as would induce live stock raisers and shippers to send their live stock to the Sioux City stock market for sale. With this purpose in view, it obtained contracts with Cudahy Packing Company and Armour & Co. to maintain and operate packing plants at the Sioux City stockyards. It entered into three contracts with the Cudahy Company. By the first, dated April 1, 1895, it conveyed to the Cudahy Company twelve acres of land and packing plant improvements thereon, and issued to it $200,000 par value preferred and common stock, in consideration for which the Cudahy Company agreed to operate said plant for a period of ten years from January 1, 1895, and during said period to purchase at the stockyards of petitioner live stock sufficient to enable it to carry on its business as it might conduct it upon the premises conveyed. By the second contract, dated November 17, 1897, petitioner conveyed to the Cudahy Company 5.13 acres of land with improvements thereon, paid that company $100,000 in cash to be expended for further improvements on such premises, and issued to it an additional $300,000 par value of its preferred and common stock, in con-

sideration for which the Cudahy Company agreed to make such necessary changes, alterations, additions, and improvements to its buildings, appurtenances, and machinery to enable it to handle and kill not less than 500 cattle daily, and not less than from 2,000 to 2,500 hogs daily, all to be purchased at petitioner's stockyards. By the third contract, dated January 1, 1906, the Cudahy Company agreed to expend $300,000 on its packing plants covered by the two previous contracts, so as to increase their capacity to 750 cattle, 3,000 hogs, and 500 sheep per day. The packing company agreed that for a period of thirteen and a half years it would purchase daily at the stockyards of petitioner the requirements of live stock to operate its packing plants at capacity. Under this contract petitioner was obligated to pay $150,-000 in cash of the stipulated $300,000 to be expended on the premises by the packing company.

By a contract dated May 14, 1901, petitioner conveyed to Armour & Co. a packing plant which had originally cost petitioner $400,000, and on which it had made subsequent improvements at a cost of $136,000, and in addition it issued to Armour & Co. 2,500 shares of its common stock, and 1,500 shares of its preferred stock, in consideration for which Armour & Co. obligated itself to operate a packing plant at petitioner's stockyards at capacity, and to buy its requirements of live stock at such yards.

By reason of these contracts, which petitioner used as collateral security in refinancing its liabilities, it was able to convey the properties mentioned to the packing companies free of all incumbrances. These contracts have been and are being carried out in all particulars, and pursuant thereto the packing companies have operated packing plants and have bought at petitioner's stockyards their requirements of live stock to operate their plants at capacity.

The decision of the Board of Tax Appeals, which affirmed the determination of the Commissioner, involves the right of petitioner to include as invested capital, as the basis for determining income and excess profit taxes for the years 1918, 1919, and 1920, the value of these contracts, in so far as that value is reflected by the exchange of stock therefor. The result of the contracts upon the fortunes of petitioner are set out in the findings of fact of the Board of Tax Appeals as follows: "By virtue of the foregoing and other contracts with packers which the petitioner was able to secure from time to time, and which were available to petitioner for use as collateral in refinancing its mortgage liabilities, it succeeded in establishing at its yards a large competitive market and the advantages accruing to the petitioner from such contracts are directly reflected in the stimulus given to the Sioux City stock market and to the receipts of livestock by the petitioner and petitioner's consequent increase in earnings. Such condition is the normal and expected outcome from relationships such as those established by the petitioner with the various packers. Such relationships are mutually advantageous and benefit both the packer and the stockyard. In addition to the buyers for the packing houses, there were in daily attendance at the stockyards other buyers whose orders and activities were correspondingly increased."

This finding is based upon convincing evidence. Shippers and live stock dealers will ship their cattle, hogs, and sheep only to such markets as assure them a sale for their live stock within a brief time after their arrival, and such markets can only be assured by the establishment of packing plants nearby, whose daily requirements are secured from favorably located stockyards. Up to the close of the year 1918, petitioner had received from the Cudahy Company and the Armour Company for its services in the care and handling of live stock purchased by these companies the sum of $2,357,912.80. In addition, large sums had been paid to it by purchasers of live stock not connected with the packing companies. Its annual receipts of hogs increased from about 350,000 in 1895 to about 2,150,000 in 1917, while its receipts of cattle during the same period increased from 100,000 annually to 700,000.

Petitioner paid its first dividend on its preferred stock at the rate of 4 per cent. per annum in 1900, and continued to pay dividends at that rate until 1905, when the rate was increased to 6 per cent. per annum. In 1905 it began paying dividends on its common stock, and paid at the rate of 2 per cent. per annum on that stock to and including the year 1920, except that the rate was approximately 3 per cent. for the years 1913 and 1916.

In disposing of petitioner's contention that there should be included as a part of its invested capital $900,000 representing the par value of the capital stock transferred to the packing companies for the contracts in question, the Commissioner held that these contracts had expired before 1918, and hence were without value. The Board of Tax Ap-

peals, however, held that the Commissioner was in error in this conclusion, and in so doing said: "We are satisfied from the evidence that a large part of the value of the contracts made by the Cudahy Packing Company and Armour and Company with the petitioner did not vanish with the expiration of the contracts. * * *. The relationship which the petitioner established with the Cudahy Packing Company and Armour and Company was approximately as valuable to the petitioner in 1918 as in the years when the contracts were, entered into between the petitioner and the packing companies. The self-interest of the packing companies would prompt them to continue this relationship even though the contracts had expired."

The Board, however, reached the conclusion that it was not able to determine from the evidence "that the contracts had a cash value to the petitioner in excess of the cash investment of the petitioner in the properties conveyed to the Packing Companies to induce them to operate packing plants in Sioux City." The holding of the Board of Tax Appeals, that the contract rights survived and were valuable, is followed by a recital that: "The record is silent as to the value of these contracts to the petitioner, either at the date the contracts were first acquired or during the taxable years involved."

It is to be observed that the Board did not, in terms at least, fix the value of the property rights acquired by these contracts, but held that the proof did not establish a value in excess of the cash investment of the petitioner in the properties actually conveyed to the packing companies. It is quite apparent from the findings, and the evidence which supports them, that the property of the petitioner would be of little, if any, value were it not for the property rights secured by these contracts. Just how the Board arrived at the conclusion that their value was limited to the cash investment in the properties conveyed in exchange for them is by no means clear, because the Board in its opinion has said that: "The record is silent as to the value of these contracts." We can only surmise that the Board's conclusion is based upon the proposition that, "The determination of the respondent upon this point is prima facie correct." When, however, the Board held that the Commissioner's decision was based upon the erroneous premise that the value of the contracts had vanished because the term for their execution had expired, then the Commissioner's determination was no longer "prima facie correct." In apparent recognition of this principle, the government contends that the Board of Tax Appeals was in error in holding that the value of the property interests acquired by these contracts had not vanished because of their expiration, but urges that the Commissioner was right in his holding, insisting, however, that the decision of the Board is correct, and, hence, should be sustained, even though based upon erroneous conclusions. We think the Board was correct in its holding that the value of the property rights acquired through these contracts had not vanished.

A somewhat similar situation was considered by the Circuit Court of Appeals of the Fourth Circuit in Gauley Mountain Coal Co. v. Commissioner of Internal Revenue, 23 F. (2d) 574, 577, where, in an opinion by Judge Parker, it is, among other things, said:

"Coming to the second question, we do not think that what was acquired by the amount paid through the reduction in the price of coal which we have discussed was a mere transitory service, nor a mere intangible increase in the value of property, such as that resulting from the discovery of mineral deposits as in the LaBelle Iron Works Case [256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998], but was a right of permanent value to the Company operating the mining property, and one which added greatly to the value of the property itself. Before the branch line was built, the mines of the taxpayer were 4 miles away from a line of railroad, and for that reason could not be operated profitably. As a result of its construction, and the railroad connection thereby acquired, the facilities of a great railway system have been brought to the mines of the company, and this has done away with the necessity of transporting the coal to the line of the railroad.

"The taxpayer has acquired property of permanent value in the same sense as does a manufacturing corporation which pays a railroad company to build an industrial siding to its plant, or a land development company which pays a bonus to a street railway company to build a line through its property. Whether the rights acquired as a result of the railroad connection obtained are to be defined as tangible or intangible property, it is not necessary to inquire. Intangible property, which enables a taxpayer to save or earn money, is as legitimate a form of capital investment as tangible property. Thus money spent in building up the circulation of a newspaper has been held to be capital invested, within the meaning of the taxing acts. Appeal of Gardner Printing

Co., 4 B. T. A. 37; In re M. Co. and O. Co., A. R. M. 141; C. B. Dec. 1921, p. 296. The railroad connection itself is quite tangible, the rights flowing therefrom are intangible; but, whether tangible or intangible, the connection and the rights incident thereto are of great value to the taxpayer, and save it many thousands of dollars annually in marketing its coal. * * *

"Nor is it important, we think, that the contract specifies no time during which the connection and the service incident thereto shall be maintained. As a practical matter, now that the branch line has been built, the connection will be maintained and the service furnished without reference to the contract. The railroad is in the business of hauling coal, and may be relied upon from motives of self-interest to continue to haul the coal from taxpayer's mines so long as it is profitable to do so. * * *

"It is clear that, although the track does not belong to the taxpayer, and the contract does not provide a specific period during which the service over it shall be continued, nevertheless the laying of the track and the railroad connection resulting therefrom established for the taxpayer a relationship with the railroad of mutual advantage and of great and continuing value to the taxpayer."

So here, the rights acquired have not been lost nor withdrawn, but the packing companies are still operating at the petitioner's yards. These companies, induced by the contracts in question, have located their packing facilities involving the expenditure of vast sums of money. These facilities were so established to enable the companies to carry on a packing house business, and they will continue to operate these plants so long as it is profitable for them so to do.

The statutes involved are to be found in the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1091, 1092, and, so far as pertinent here, are as follows:

"Sec. 325. (a) That as used in this title—

"The term 'intangible property' means patents, copyrights, secret processes and formulæ, good will, trade-marks, trade-brands, franchises, and other like property;

"The term 'tangible property' means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property. * * *

"Sec. 326. (a) That as used in this title the term 'invested capital' for any year means (except as provided in subdivisions [b] and [c] of this section);

"(1) Actual cash bona fide paid in for stock or shares;

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case, such excess shall be treated as paid-in surplus: * * *

"(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest;

"(5) * * * Provided, That in no case shall the total amount included under paragraphs (4) and (5) exceed in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year."

■ It is clear that these contract rights represent invested capital. Lincoln Chemical Co. v. Edwards (C. C. A.) 289 F. 458; Gauley Mountain Coal Co. v. Commissioner (C. C. A.) 23 F.(2d) 574; Rookwood Pottery Co. v. Commissioner (C. C. A.) 45 F.(2d) 43, 45; News Publishing Co. v. Commissioner, 58 App. D. C. 295, 29 F.(2d) 955.

In the final analysis, the decision of the Board amounts to a holding either that the $900,000 par value of stock issued to the packing companies in part consideration for these contracts was of no value, or the Board made no finding as to its value. We think there was substantial evidence tending to establish a value in this stock.

(1) Petitioner's articles of incorporation provided that: "The preferred stock shall be entitled to priority, both in principal and dividends, over the common stock, and all such stock, both common and preferred, shall be fully paid for in cash or its equivalent at or before the time the same is issued."

■ There was a presumption that this provision of the articles of incorporation was not violated. Mannington v. Hocking Valley Ry.

Co. (C. C.) 183 F. 133; Chattanooga Savings Bank v. Brewer (C. C. A.) 17 F.(2d) 79; In re Smith, Thorndike & Brown Co. (C. C. A.) 170 F. 900; Providence Engineering Corp. v. Downey Shipbuilding Corp. (C. C. A.) 294 F. 641; Mine & Smelter Supply Co. v. Stockgrowers' Bank (C. C. A.) 173 F. 859; Planters' Operating Co. v. Commissioner (C. C. A.) 55 F.(2d) 583, 586. As said by this court in Planters' Operating Co. v. Commissioner, supra, a case in which stock had been issued for a lease: "The presumption is that the petitioner corporation acted lawfully instead of unlawfully in the issuance of its stock, and that the lease purchased had value."

It must be borne in mind that there is in the instant case no question of evading the higher tax, because all the transactions involved happened long before the revenue acts were passed, and their good faith is questioned by no one.

(2) It is to be noted that at least some of the stock of the petitioner was selling, and had been sold, at par for cash prior to any of these transactions, and no stockholder, whether he paid for his stock in cash at par or otherwise, seems to have questioned either the bona fides of these transfers of stock or the value of the property rights acquired by the company therefor; so that we have the contemporaneous acts of all the interested parties, which, in effect, sanctioned the valuation placed upon these contract rights, including that represented by the stock issued as part consideration therefor. The interest of other stockholders required them to object to this transaction, unless the company was receiving property equivalent to the par value of the stock. As said by Judge Denison in Rookwood Pottery Co. v. Commissioner, supra: "The contemporaneous sale of the remainder of the capital stock, for cash, at par, confirmed this valuation. Every one who purchased any of this stock thereby acquiesced in this appraisal of these intangibles; it was only this appraisal that gave this additional capital stock the par value at which it was sold on the market."

The board of directors of the petitioner, at the time of entering into these contracts, agreed with the board of directors of the packing companies as to their value, and these appraisals so made in the regular course of business by those peculiarly qualified to determine these values, acquiesced in by the stockholders of the petitioner, including those who had bought stock at par for cash, constitute competent and persuasive evidence of value.

(3) It appears from the evidence that this stock had an actual value because it has been paying dividends. Even before the contract was made with Armour & Co., or before the third contract with the Cudahy Company, this stock had been paying dividends, and has been paying substantial dividends ever since that time. Can it be said that the preferred stock of this going concern, which has paid dividends at the rate of 4 per cent. from 1901 to 1905, and at 6 per cent. since 1905, has no value and had no value when issued; or can it be said that the common stock of this concern, which carried with it the power to control its management, and which has paid dividends at 2 per cent. from 1905 to 1920, and at 3 per cent. in the years 1913 and 1916, has no value and had no value when issued? Indeed, the very proceeding here involved, having for its purpose the determination of the amount of excess profit tax which should be assessed against the petitioner, tends to indicate that its stock, all of which has been paying dividends, had at the time it was issued and transferred to the packing companies substantial value.

All of these facts and circumstances were in evidence before the Board and clearly and distinctly tended to show value in this stock. This proof was uncontradicted, and the Board makes no finding as to what the value was, but apparently rests its decision upon a presumption that the finding of the Commissioner was correct, which finding, as pointed out, the Board very correctly held was based upon the erroneous assumption that the property value in these contracts had vanished with their expiration. It may well be that the proof was not such as the Board desired, but it must be borne in mind that these transactions occurred some thirty years ago and doubtless the proof adduced was the best available, and, standing unchallenged, was such as could not be simply brushed aside as unsatisfactory. What is said in Rookwood Pottery Co. v. Commissioner, supra, seems here apposite. It is there said: "The Board of Tax Appeals has made no definite finding that these assets did not have this value, or that the fair value was some smaller sum. It has contented itself with holding that the taxpayer has not sufficiently proved its proposition. * * * The opinion of the board shows that it regarded the taxpayer as under the legal burden of proving this value 'with certainty'; and upon this basis it concluded that uncertainty remained. In this premise,

**we** think the board was in error. We see no reason why the taxpayer did not make its case when it put in proofs clearly and distinctly tending to show this value; and when the proofs so introduced remained unchallenged by contrary proofs or by destructive analysis, it was the duty of the commissioner to decide the issue in accordance with the proof, then appearing before him; and it was, we think, the duty of the board to take the same view."

In Planters' Operating Company v. Commissioner, supra, this court said:

"There was also relevant evidence of the value of the lease in the price paid for the same. It was paid for in stock of the lessee company. There was evidence that, shortly before the time when this stock was issued, other stock of the company had been sold at par for cash to the extent of $30,000. There was also evidence that the $200,000 stock which was issued for the lease had been subscribed for, and the subscription was withdrawn so that the stock might be issued in payment for the lease.

"It is to be noted that the purchase of the lease by the petitioner was approved both by the board of directors and by the stockholders of petitioner."

█ The Board of Tax Appeals is a fact-finding body, and as such it was its duty to arrive at some reasonable conclusion, where it has before it substantial evidence which is uncontradicted. As said by Judge Page in Chicago Railway Equipment Co. v. Blair (C. C. A.) 20 F.(2d) 10, 12: "Of course, every trier of fact should decide cases upon a conviction reached from a consideration of the evidence, and clearly evidence that produces such conviction must be satisfactory and convincing; but it is a well-known rule of law that triers of fact must be satisfied and convinced, if the evidence adduced, fairly considered, preponderates for or against a given proposition. When the evidence before a trier of fact ought to be convincing, he may not say that it is not. Whether he is a judge or a commissioner, the facts must be fairly and judicially weighed, and a determination reached thereon."

In Cohan v. Commissioner of Internal Revenue (C. C. A.) 39 F.(2d) 540, 543, the court, in considering the refusal of the Board of Tax Appeals to allow anything on account of expenditures made in the production of a play, in an opinion by Judge Learned Hand, among other things, said: "At the trial before the Board he estimated that he had spent eleven thousand dollars in this fashion during the first six months of 1921, twenty-two thousand dollars, between July first, 1921, and June thirtieth, 1922, and as much for his following fiscal year, fifty-five thousand dollars in all. The Board refused to allow him any part of this, on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details. The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent."

In Conrad & Co. v. Commissioner of Internal Revenue, 50 F.(2d) 576, 579, the Circuit Court of Appeals of the First Circuit, in reviewing a decision of the Board of Tax Appeals which found that the good will cost the taxpayer a substantial amount, but that the exact amount could not be definitely determined, and hence allowed no sum whatever, said, inter alia:

"It having been made to appear beyond conjecture that the good will was acquired at a substantial cost, the mere fact that it could not be measured exactly is no reason for not applying the best judgment of the members of the board in fixing on some amount, at least as a minimum cost. If the evidence left it to conjecture as to whether there was any cost to the partners, the board could properly have refused to go any farther, but if the evidence satisfied the board that the good will was acquired at a substantial cost, then it was their duty to express the 'substantial cost' in dollars and cents.

"While there appears to be some conflict in the authorities as to the definiteness of the proof required by the taxpayer in such matters, and the courts have held that where a material fact on which relief depends is not susceptible of proof, it leaves the party on whom the burden rests with an unenforceable claim, still we do not think justice should be denied him who offers substantial proof of value when that is the material fact, because he cannot prove it with mathematical exactness. Triers of fact are constituted to arrive at some reasonable conclusion when the evidence is substantial. Values are not conjectural because arrived at on judgment based

on 'substantial evidence.' To refuse to fix any value on property because not clearly shown would be an arbitrary denial of justice and an error of law. L. S. Plant & Co. v. Commissioner (C. C. A.) 46 F.(2d) 306; Cohan v. Commissioner (C. C. A.) 39 F.(2d) 540; Kendrick Coal & Dock Co. v. Commissioner (C. C. A.) 29 F.(2d) 559."

In view of the substantial evidence in this record, the refusal of the Board to allow any value for the stock of petitioner exchanged as a part of the consideration for, and, therefore, invested in these contract rights, was unwarranted. It was the duty of the Board, from the substantial evidence before it, to determine that value. The decision of the Board of Tax Appeals is therefore reversed, and the case remanded for further proceedings not inconsistent with the views herein expressed.

STONE, Circuit Judge.

I feel impelled to dissent for the reasons following:

Section 326 (a) (2) requires that the amount which may be included in invested capital is the "actual cash value of tangible property," but in no case to exceed the par value of the stock issued therefor. This provision obviously requires proof of the actual cash value. The repeated decisions of the Supreme Court place upon the taxpayer the burden of making such proof where he is contending for its existence against a tax exaction (Burnet v. Houston, 283 U. S. 223, 227, 228, 51 S. Ct. 413, 75 L. Ed. 991; Botany Mills v. United States, 278 U. S. 282, 49 S. Ct. 129, 73 L. Ed. 379; Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385). The mere fact that it may be difficult or impossible for the taxpayer to make this proof is no relief from the burden, for, as said in Burnet v. Houston, 283 U. S. 223, 228, 51 S. Ct. 413, 415, 75 L. Ed. 991:

"We cannot agree that the impossibility of establishing a specific fact, made essential by the statute as a prerequisite to the allowance of a loss, justifies a decision for the taxpayer based upon a consideration only of the remaining factors which the statute contemplates. The definite requirement of section 202 (a) (1) of the act is not thus easily to be put aside. The impossibility of proving a material fact upon which the right to relief depends, simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof. Compare Underwood v. Wing, 4 De Gex, M. & G. 632, 660; Newell v. Nichols, 75 N. Y. 78, 90, 31 Am. Rep. 424; Estate of Ehle, 73 Wis. 445, 459, 460, 41 N. W. 627; 2 Chamberlayne, Modern Law of Evidence, § 970.

"Neither can the presumption be indulged that the cost of respondent's interest in 1906 was the value of that interest in 1913, for non constat that such cost was the value even in 1906."

Under the issues here, it was incumbent upon petitioner to prove the cash value of these contracts in order to show that such value covered not only the other very valuable considerations given by petitioner therefor, but $900,000 in addition as representing the value of this stock given to the packing companies. It seems to me that the petitioner has gone no further than proving that these contracts were very valuable, if not essential, to its existence; but this is far from proving the cash value thereof.