## MARQUETTE OIL DISTRIBUTION CO. v. COMMISSIONER OF INTERNAL REVENUE (two cases).
### Nos. 9902, 9903.

Circuit Court of Appeals, Eighth Circuit.
Oct. 3, 1934.

H. Kennedy McCook, of Washington, D. C. (De Vries, Crawford & McCook, of Washington, D. C., on the brief), for petitioner.

Robert N. Anderson, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before BOOTH, Circuit Judge, and MUNGER and BELL, District Judges.

BOOTH, Circuit Judge.

There are here two petitions for review of one decision of the Board of Tax Appeals, which decision covered two matters: (1) The alleged deficiency in the income taxes of the Marquette Oil Distribution Company for the year 1925; (2) the alleged similar deficiency for the years 1926 and 1927.

The Board of Tax Appeals, by its order of redetermination (in its case No. 39127) found a deficiency for the year 1925; and by a similar order (in its case No. 48,743) found a deficiency for the years 1926 and 1927. The two orders were made pursuant to the one decision above mentioned.

Petitions for review followed and were consolidated for hearing in this court.

The facts in the controversy are largely undisputed and are substantially as follows:

"The petitioner is a South Dakota corporation, organized on September 24, 1924, with its principal office in St. Paul, Minnesota. It was organized to take over a certain oil and gas property from the majority stockholders of the Iowa Oil and Refining Company which was in process of liquidation.

"Prior to 1924 the Iowa Oil and Refining Company and certain individuals, who were the majority stockholders of that company, became indebted to the First National Bank of Sioux City, Iowa, the Sioux Falls Trust and Savings Bank of Sioux Falls, South Dakota, and the Midland National Bank of Minneapolis. As collateral security for such indebtedness the individuals deposited their stock of the Iowa Company. Early in 1924 dissension arose among the stockholders and it was determined to liquidate by transferring to the majority stockholders a certain oil and gas property known as the Horton lease, the minority stockholders receiving certain other property. Before the proposed liquidation could be effected, it was necessary to satisfy the creditor banks. Under date of June 12, 1924, the individuals executed and delivered a warranty deed covering the Horton property to C. B. Mills, who was president of the Midland National Bank, which was one of the creditors. On September 5, 1924, the Iowa Company assigned to Mills all of its right, title and interest in and to its oil and gas lease on the Horton property."

Mills thus became the holder of the legal title to the Horton property.

On December 10, 1924, a trust agreement was entered into between C. B. Mills as trustee, party of the first part; the three banks mentioned above, parties of the second part; the individuals mentioned above, parties of the third part; and the petitioner corporation, party of the fourth part.

The provisions of the trust agreement, so far as here material, are set out in the margin.[*]

* "Whereas, A. D. Horton, John J. Large and the Estate of F. E. Watkins, deceased, are jointly and severally indebted to the Banks, in various amounts hereinafter set forth, and

"Whereas, heretofore there had been deposited with the Trustee certain stock of the Iowa Oil & Refining Company belonging to some of the Parties of the Third Part, as collateral security for the

payment of said obligations, among other things, and

"Whereas, there are certain other obligations existing on the part of the Iowa Oil & Refining Company to be paid, which obligations are hereinafter specifically described, and

"Whereas, there are certain other obligations existing as between some of the Parties of the Third Part, to which spe-

Before the trust agreement was entered into, and apparently before Mills had obtained title to the Horton property, he executed on February 5, 1924, a special warranty deed covering the property to the Marquette Company. The deed was acknowledged February 5, 1925.

After the trust agreement was entered into, and on April 16, 1927, Mills executed a special warranty deed of the Horton prop-

cific reference is hereinafter made, and

"Whereas, it was desired by all the parties hereto that arrangements be made for the purpose of reducing and discharging all of said indebtedness under the terms and conditions hereinafter set forth, and

"Whereas to that end and purpose the Iowa Oil and Refining Company transferred certain properties located in the State of Oklahoma, described as the Horton Lease, to some of the Parties of The Third Part, in consideration among other things, of the surrender by said Third Parties of their stock in the Iowa Oil & Refining Company, hereinbefore described, and

"Whereas, said property was afterwards deeded to the Company, for the sum of One Hundred Thousand ($100,-000) Dollars, paid in and by the capital stock of said Company which stock was duly issued and is now held in the following amounts: * * *

"Whereas, said stock, except certain qualifying shares thereof, has been transferred to the Trustee for the purposes and under the terms and conditions hereinafter set forth and contained, and

"Whereas, there will be from time to time paid to the Company certain royalty payments upon said Horton Lease (under and pursuant to certain written instruments covering such payments) which royalty payments as hereinafter provided, are to be applied against said indebtedness before any distribution thereof shall be made to the stockholders of the Company, and

"Whereas, the parties hereto desire to enter into this Indenture defining, determining and limiting the various rights and interests of the parties hereto existing and growing out of the premises and by reason of the facts hereinbefore recited and to that end and purpose have entered into this Indenture.

"Now Therefore, For and in consideration of One ($1.00) Dollar and other valuable consideration paid and received by each of the parties hereto, to and from each of the other parties, the receipt and sufficiency whereof is by the execution of these presents acknowledged by each and all the parties hereto, and in further consideration of the promises, agreements and undertakings of the parties hereto to be kept and performed as hereinafter contained, and in consideration of other valuable consideration paid and received by each of the parties hereto, the parties hereto do promise and agree, to and with each other, as follows, that is to say:

"Article I. The Trustee does hereby promise and agree:

"1. That he will receive and hold as the same are paid him from time to time by the Company, during the existence of this Indenture, said royalty payments, In Trust Nevertheless, for the following uses and purposes:

"(a) To apply the same upon the indebtednesses in the next succeeding paragraph hereof described and which indebtednesses are defined immediately in the terms of the obligees thereof, but which indebtednesses are to be paid in the sequence hereafter in this Indenture provided and not otherwise: * * *

"3. To account from time to time to the parties to this Indenture for his receipts and disbursements in connection herewith, provided that such accounting need not be rendered more often than once every three (3) months.

"4. To return the stock of the Parties of The Third Part now endorsed in blank and held by him as collateral hereunder, to the respective owners thereof, or to persons duly designated by them in writing upon the termination of this indenture by the discharge of the indebtedness herein described, but not otherwise.

"Article II. The Banks, And Each of Them, do hereby promise and agree, for themselves, as the case may be, and individually but not jointly:

"1. To forbear any enforcement at law, or by action or other procedure of any of the obligations or notes hereinbefore described of which they are the respective owners and holders so long as they shall receive payments from said Trustee under the terms and conditions hereof, provided, however, * * *

"Article III. The Parties of The Third Part, and each of them, do hereby promise and agree:

"1. To endorse in blank and deposit with the Trustee their respective stock in the Company as collateral security for the payment of the obligations hereinbefore described, but said collateral shall be held by the Trustee as security for said obligations in the same sequence as said obligations are described in paragraph (1) of Article (1) hereof and not equally or ratably for all of said obligations, and the execution by the Trustee of a copy of this Indenture will be an acknowledgment

erty to the Marquette Company. This deed was acknowledged April 16, 1927. Neither this deed nor the deed of February 5, 1924, was ever recorded, nor was physical delivery of either ever made. Mr. Mills, who executed these deeds, testified: "I executed them, in order that they might be used in case of my death."

by the Trustee of the receipt and deposit of all of said stock.

"2. To, and by the execution of this indenture do jointly and severally consent that no distribution of the funds of the Company shall be made to the stockholders of the Company as dividends or other distribution, regardless of form (except, however, expenses of the Company) until all of said obligations and the accrued interest thereon shall have been paid and the terms of this Indenture performed and discharged.

"3. To vote their stock at any meeting of the stockholders of the Company during the term of this Indenture as the Trustee shall indicate * * *

"5. To, and by the execution of this indenture do hereby consent to the payment by the Company to the Trustee of any and all sums received by the Company as royalties or otherwise from time to time, during the existence of this Indenture, without further action by the stockholders or directors of the Company, and all such payments made by the Company to the Trustee and all acts of the officers of the Company under the provisions hereof, are in all respects ratified, confirmed and adopted.

"The Company does hereby promise and agree

"1. To pay to the Trustee from time to time, as the same shall be received, its income, less all expenses, charges, deductions, taxes and other disbursements necessary in the course and conduct of its business, but such payments made to the Trustee are made without any liability whatsoever on the part of the Company as to the distribution thereof by the Trustee; and provided further, that the Company shall be under no liability or duty to account to the Trustee for its income, but the amount to be paid by the Company to the Trustee hereunder shall be determined solely and exclusively by the Company.

"Article IV. It is Further Understood and Agreed, By all the parties hereto:

"1. That if the Trustee is subject to any expenses of any kind or nature, he shall first have the right to deduct such expenses from any and all sums received by him, and said expenses shall be deemed to include the employment of counsel in connection with any matters arising under the administration or construction of this Indenture, or by reason of any suit or action which may arise therefrom. * * *

"That no salaries shall be paid to its officers so long as this indenture shall remain in force and effect, and the entire income of the Company from said Horton lease, less its taxes and other expenses and deductions, shall be paid to the Trustee until this trust shall have been fully administered. * * *

"That the Trustee shall not be in any way personally liable for any act or omission on the part of any of the parties hereto, nor for any error of judgment or mistake of fact or law, nor for anything whatsoever, except for his own individual, wilful malfeasance or neglect; and nothing in this indenture shall be in any way construed as requiring the Trustee to take any steps at law or equity or otherwise to carry out and perform the terms of this indenture, except those to be performed by himself; but in the event any of the parties hereto shall for any reason fail or refuse to perform any part of this indenture to be carried out or performed by such party or parties the Trustee shall, upon written request of a majority of the Banks, if the default be on part of any of the third parties or of the fourth party, but in the event the indebtednesses to the Banks have been fully satisfied, then, upon the written request of a majority of the remaining beneficiaries hereunder, or if the default be on the part of the Banks or any of them, then, upon written request of the majority of the third parties, and upon being furnished with assurance sufficient to the Trustee of proper indemnification to the Trustee, for all purposes, proceed to employ counsel and to take such action against such defaulting party or parties as may be necessary or advisable, and as often as the same may occur. * * *

"A majority of the beneficiaries hereunder shall have at all times the right to remove any Trustee hereunder, if in their judgment such action shall be deemed expedient or necessary; and in the event and as often as the same may occur that any of the indebtednesses to be paid to any beneficiary hereunder shall have been paid, such beneficiary or beneficiaries shall no longer have any right as to the removal or appointment of a Trustee, and for the purposes of this indenture, 'beneficiaries' shall be construed and held to mean the individuals, representatives and/or corporations named as creditors in subdivisions 1 to 8, both inclusive of section (a) of paragraph 1 of Article I hereof."

At the time of the execution of the later deed, Mr. Mills was trustee under the trust agreement of December 10, 1924, and was also president of the Marquette Company.

One of the findings of fact of the Board of Tax Appeals is that the provisions of the trust agreement were carried out.

Mills acted as trustee until the latter part of 1927, when he was succeeded by A. D. Horton, who was vice president of the Marquette Company.

A deed and also an assignment of royalty were thereupon executed and delivered by Mills to Horton covering the Horton property.

The main duties of the trustee consisted in collecting the royalties under the Horton lease and in making payments out of the proceeds in accordance with the terms of the trust agreement.

The royalty checks were made payable to Mills as trustee, and were placed in a bank account in the name of the Marquette Company. The proceeds were then transferred to a personal account of Mills, and he gave his checks on that account to the beneficiaries of the trust.

The Marquette Company had no income except the royalties from the Horton lease.

Mills knew that the stock of the Marquette Company represented the ownership of the Horton lease and that the lease constituted the asset behind the stock.

The Marquette Company reported the income from the Horton lease for the calendar year 1925 in its income tax return for that year, but the Commissioner made certain corrections and determined a deficiency in tax of $521.27.

For the calendar years 1926 and 1927, the Marquette Company made no return of income from the Horton lease, but the returns for those years contained the statement: "This Company has no income nor expense on its own account." No items of income or deduction were shown. The Commissioner determined the deficiencies for those years respectively at $4,509.31 and $2,316.89. The Board of Tax Appeals redetermined the deficiencies for the three years at the same figures.

The sole main question involved in the petitions for review is whether the petitioner, the Marquette Company, is liable for income tax upon the income made up of the royalties from the Horton lease.

The relevant statutes are set out in the margin.*

There is no question involved as to the construction of the language of the statutory provisions, but the contention of petitioner, the Marquette Company, is that it is not taxable on the income so made up during the taxable years in controversy, because it was not the owner of the Horton lease, but that Mills was the owner thereof.

We cannot agree with this contention for several reasons.

First, the whole theory of the structure of the trust agreement is that the Marquette Company was the owner of the Horton lease. We think that this is demonstrated by the provisions of the instrument itself. One of the recitals of the trust agreement is:

** Section 230 of the Revenue Act of 1924 (43 Stat. 282, see 26 USCA § 981 note): "In lieu of the tax imposed by section 230 of the Revenue Act of 1921 there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax * * *."

Section 230 of the Revenue Act of 1926 (26 USCA § 981 note): "(a) In lieu of the tax imposed by section 230 of the Revenue Act of 1924, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation, a tax * * *."

Section 233 of the Revenue Acts of 1924 and 1926 (26 USCA § 985): "(a) In the case of a corporation subject to the tax imposed by section 230 the term 'gross income' means the gross income as defined in sections 213 * * *."

Section 213 of the Revenue Acts of 1924 and 1926 (26 USCA § 954):

"For the purposes of this title, except as otherwise provided in section 233—

"(a) The term 'gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period."

"Whereas, there will be from time to time paid to the Company certain royalty payments upon said Horton lease (under and pursuant to certain written instruments covering such payments) which royalty payments as hereinafter provided, are to be applied against said indebtedness before any distribution thereof shall be made to the stockholders of the Company."

Article I of the Trust Agreement provides:

"The Trustee does hereby promise and agree:

"1. That he will receive and hold as the same are paid him from time to time by the Company, during the existence of this indenture, said royalty payments, In Trust Nevertheless, for the following uses and purposes."

Paragraph 3 of article I provides that the trustee shall "account from time to time to the parties to this Indenture for his receipts and disbursements."

Paragraph 4 of the same article provides that the trustee shall return to the owners thereof, upon termination of the trust, the stock of the Marquette Company held by him as collateral.

Article III also provides that the owners of the stock in the Marquette Company shall indorse their stock to the trustee to be held by him as collateral to the carrying out of the trust agreement.

Paragraph 2 of article III provides that there shall be no distribution of funds of the Marquette Company to its stockholders until discharge has been made of the obligations mentioned in the trust agreement. The same paragraph provides for payment of the expenses of the Company out of the funds of the Company.

Paragraph 5 of article III provides that the stockholders of the Marquette Company "do hereby consent to the payment by the Company to the Trustee of any and all sums received by the Company as royalties or otherwise from time to time, during the existence of this indenture."

It is also provided in article III that the Marquette Company shall "pay to the Trustee from time to time, as the same shall be received, its income, less all expenses, charges, deductions, taxes and other disbursements necessary in the course and conduct of its business * * * provided * * * that the Company shall be under no liability or duty to account to the Trustee for its income, but the amount to be paid by the Company to the Trustee hereunder shall be determined solely and exclusively by the Company."

Article IV, paragraph 1, provides: "That if the Trustee is subject to any expenses of any kind or nature, he shall first have the right to deduct such expenses from any and all sums received by him."

In the addenda to the trust agreement it is provided: "That no salaries shall be paid to its officers so long as this indenture shall remain in force and effect, and the entire income of the Company from said Horton lease, less its taxes and other expenses and deductions, shall be paid to the Trustee until this trust shall have been fully administered."

Also in the addenda it is provided: "A majority of the beneficiaries hereunder shall have at all times the right to remove any Trustee hereunder, if in their judgment such action shall be deemed expedient or necessary."

Many of these quoted provisions would be meaningless unless the Marquette Company was the owner of the Horton lease; they are harmonious and pregnant with meaning, however, if the Marquette Company was the owner of that lease.

Second, we think that ownership by the Marquette Company of the Horton lease is shown by the acts of the various interested parties after the making of the trust agreement.

The Board of Tax Appeals has found that the provisions of the trust agreement were carried out. This finding includes, among other matters, the collection of the royalties under the Horton lease; the placing of the same (less expenses of the Marquette Company) in the hands of the trustee; the disbursement of the same (less expenses of the trustee) by the trustee in accordance with the terms of the trust. All of these steps were taken during the taxable years in controversy.

It is true that instead of the collections being made by the Marquette Company and turned over to the trustee, the collections were made by the trustee; but this was simply a shorthand method of getting the funds into the hands of the trustee.

The funds were treated by the trustee not as his own but as belonging to the Marquette Company; and for the year 1925 an income tax return for that Company was made, verified by Mills and covering the collections of royalties from the Horton lease for that year, and items of expense amount-

ing to $3,457.00 of the Marquette Company as deductions from those collections.

In the face of these acts and admissions, the later claim that Mills was the owner of the Horton property takes on a feeble aspect.

■ Third, in support of the contention that the Marquette Company was not the owner of the Horton lease, the claim is made that the title which at one time was vested in Mills never passed from Mills to the Marquette Company because there was no delivery of the deeds executed by Mills which purported to convey the property from him to the Company.

We think that the claim of nondelivery of the deeds cannot be sustained.

In reference to this matter, the Board of Tax Appeals found as follows: "By warranty deed dated '* * * day of February, 1924,' but bearing an acknowledgment under date of February 5, 1925, Mills conveyed the Horton property to petitioner. There was no physical delivery of the deed to it."

Counsel for petitioner apparently takes the position that this finding is equivalent to one that there was no delivery of the deed mentioned, and hence that the title remained in Mills. We do not so construe the finding of the Board of Tax Appeals.

[■■ It is, of course, elementary that as a general rule the delivery of a deed is essential to its validity; but whether or not there has been a delivery must be determined upon the facts of each particular case. A manual handing the instrument over by the grantor to the grantee is not indispensable. Such we understand to be the general law, and also the law in Oklahoma, where the land covered by the Horton lease was situated. In re Jackson Brick & Tile Co. (D. C.) 189 F. 636; Johnson v. Craig, 37 Okl. 378, 130 P. 581; Hall v. Dollarhide, 116 Okl. 180, 244 P. 813.

What are the facts as to delivery disclosed by the record in the case at bar?

In an attempt to liquidate and settle the affairs of the Iowa Oil & Refining Company, the Horton lease was transferred by that Company to its majority stockholders. Later, in the same attempt and for the same specific purpose, those stockholders and the Iowa Company, by separate instruments, conveyed the Horton lease to Mills. Still later in the same attempt, and for the same specific purpose, the trust agreement of December 10, 1924, was entered into. This agreement was signed, among others, by Mills and by the Marquette Company. The trust agreement recited that the Horton lease had been conveyed to the Marquette Company and that Company had paid $100,000 of its stock for the same. There is no question that the stock was issued, and that it was placed by the owners thereof in the hands of Mills as collateral to the carrying out of the trust agreement.

A deed of the Horton lease had, in fact, been executed by Mills to the Marquette Company. Mills was president of that Company. The delivery of the deed by Mills, grantor, to Mills, president of the Marquette Company (grantee), could be nothing but a gesture plus an intent on the part of Mills, grantor. Did he have such intent?

The various provisions above set out of the trust agreement give a conclusive answer to the question. To hold that Mills had no intent to deliver the deed to the Marquette Company, in view of all the facts and circumstances, would be to hold that several of the various parties to the trust agreement had stultified themselves.

The fact that the deed from Mills to the Marquette Company was not recorded does not affect its validity as between the parties. This matter is expressly covered by section 5251, Compiled Oklahoma Statutes (1921).

We have no hesitation in holding that there was a sufficient delivery of the deed from Mills to the Marquette Company covering the Horton lease.

■ It is further contended on behalf of the Marquette Company that even though the title to the Horton lease was held by the Company, yet in view of the trust agreement, the Company was a mere conduit through which the income from the lease passed to the beneficiaries under the trust.

The case of Central Life Assur. Soc., Mut. v. Com'r, 51 F.(2d) 939 (C. C. A. 8), is cited. We think the facts in that case, when properly understood, do not support the contention of petitioner in the case at bar.

In the case at bar, the conduit was Mills, the trustee—confessedly so by the terms of the trust agreement and by his own testimony. The Marquette Company had a real and substantial interest in the royalty payments, first, to deduct any expenses properly incurred in connection therewith, as was done by that Company in 1925; second, after the obligations mentioned in the trust agreement were liquidated, the whole of the royalty payments under the Horton lease belonged to the Marquette Company. The

Marquette Company was the earner of the income through its ownership of the Horton lease. See Van Meter v. Commissioner of Internal Revenue, 61 F.(2d) 817 (C. C. A. 8).

This is not a case of conflicting legal rights between the grantee of a recorded deed and the grantee of a prior unrecorded deed; but a case involving the question of allocation of income taxes to the owner of the income. The burden of proof was upon the petitioner to show that the determination of the Commissioner was not correct. We think this burden has not been sustained. Burnet v. Houston, 283 U. S. 223, 227, 51 S. Ct. 413, 75 L. Ed. 991; Crowell v. Commissioner (C. C. A.) 62 F.(2d) 51.

Our conclusion is that the petitioner, the Marquette Company, was the owner of the property in question, and that it was liable for the tax upon the income therefrom for the taxable years in controversy.

The decision and order of the Board of Tax Appeals are confirmed.