FRANK J. MOORE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77485.   Promulgated February 23, 1938.

R. M. O'Hara, Esq., for the petitioner.
L. W. Creason, Esq., for the respondent.

OPINION.

TYSON: This proceeding involves income tax deficiencies a portion of which had been assessed on November 11, 1933, and fraud penalties for the calendar years 1929, 1930, and 1931, as follows:

| Year | Deficiency assessed Nov. 11, 1933 | Total deficiency determined | 50-percent penalty |
|------|----------|----------|----------|
| 1929 | $2,473.20 | $22,276.72 | $11,138.36 |
| 1930 | 2,277.74 | 21,163.12 | 10,565.52 |
| 1931 | 1,672.58 | 1,672.58 | 836.29 |

Petitioner assigns as error the respondent's determination (1) that petitioner had taxable income from racing transactions in excess of that reported on his return for each of those years and (2) that he filed a false and fraudulent income tax return for each of those years. Further, petitioner pleads the statute of limitations in bar of assessment and collection of any deficiency for either of those years. Also, petitioner seeks a determination that the portion of the deficiencies in controversy which were assessed on November 11, 1933, constitute overassessments.

The respondent affirmatively alleges that petitioner filed false and fraudulent returns with intent to evade tax for each of the years 1929, 1930, and 1931 and that with intent to evade tax he willfully failed to keep books and records as required by the tax laws and regulations and willfully understated his income from his business of accepting wagers on horse races by the amounts of $117,625.02 for 1929, $110,592.72 for 1930, and $22,787.78 for 1931. By amended answer, respondent alleges the due execution and filing of a waiver for the year 1930. By reply, the petitioner denies all of the respondent's affirmative allegations.

The petitioner is an individual, having his principal office in New York City, New York. During the years in controversy, and also prior and subsequent thereto, the petitioner, as a bookmaker and betting commissioner, was engaged in the business of accepting wagers on horse races at various race tracks in New York State. As a bookmaker he accepted wagers in which he alone participated with the other party to the wager. As a commissioner he accepted wagers and hedged by betting a portion thereof, in his own name, with other bookmakers.

Petitioner regularly maintained an office and employed a cashier and a bookkeeper. During the racing season of about 26 weeks the petitioner employed from 10 to 18 additional persons to assist him at his book stands, in the club houses, in the turf and field enclosures,

and in the grandstands, to receive bets as well as to furnish information and services to his patrons. His pay roll during the five or six months of the racing season in each year amounted to approximately $52,000. The cashier handled all of the money used in the business, received all the bets, and made all of the pay-offs. The bookkeeper kept a journal in which he made daily entries of petitioner's bank deposits and withdrawals on account of his wagering transactions, both as a betting commissioner and a bookmaker, and also entries of bank deposits of dividends and rents and withdrawals for petitioner's personal use.

The petitioner's so-called "bank roll" was taken in cash to the track each day by his cashier. As bets were accepted the cashier received the money therefor. Each bet was immediately recorded on a separate card which showed whether the bet was by cash, check, or on credit. After each race the cashier paid the winners in cash if they so desired and marked the cards accordingly, but some of petitioner's patrons wished to be and were paid by check or by cash on the following day. If petitioner cashed checks or loaned money as an accommodation at the track, the cashier made entries on cards reflecting such transactions. After return of the petitioner and his employees to petitioner's office from the race track the day's business was balanced by checking the entries on the cards with the "bank roll", other cash and checks brought back from the track. Frequently the "bank roll" was held overnight in the office safe for use in the next day's business. The other cash was usually placed in a bank night depository and the checks were deposited in bank the following day.

Each day's deposits of cash and checks were posted in the journal on the left-hand side of the page under the heading of "deposits" for that day. Each check was listed by the name of its drawer and its amount. The total amount of cash deposited was usually designated "P. M.", meaning night depository. In two instances, occurring in September 1931, the cash brought back from the track by the cashier in the amounts of $857 and $1,000, respectively, was turned over to petitioner instead of being deposited in bank and was so entered on the journal under "deposits." All deposits from petitioner's racing transactions were made in the National City Bank or the Saratoga Bank, except once in November 1931, when the amount of $909 was deposited in the County Trust Co. and so entered on the journal.

Each day's withdrawals from banks were posted in the journal on the right-hand side of the page under the heading of "Checks Drawn" for that day. Checks drawn on the following day to pay winners of the preceding day were listed in the names of the payees and in their respective amounts. The proceeds of certain checks

drawn to cash, and so entered on the journal without any identifying letters, were used to pay off winners who preferred to come to petitioner's office to collect. The total amount withdrawn to pay off bets by cash at the track on the following day was covered by one check drawn to cash and entered on the journal as "Cash ENV." The total amount withdrawn each week to meet petitioner's pay roll was covered by one check drawn to cash and entered on the journal as "Cash PR." The withdrawal, when necessary, of funds to be used as the "bank roll" at the track was covered by a check drawn to cash and entered on the journal as "Cash BR." Withdrawals of funds for petitioner's personal use were usually covered by checks drawn to cash and entered on the journal as "Cash PER" or "Cash FJM," but some withdrawals for petitioner's personal use were by checks made payable to petitioner's personal creditors, in which instances the name of the payee and the amount were entered on the journal.

For each of the years 1929, 1930, and 1931 a journal was kept on the basis of the above described method of making daily entries. For each of those years the journal recorded all of petitioner's deposits of funds derived from his business of accepting wagers and also recorded all withdrawals pertaining to the carrying on of such business. The journal for 1931 was submitted in evidence, but neither the journal for 1929 nor 1930 was so submitted, both having been destroyed. An examination of the journal entries for 1931 discloses that no definite ascertainment of the exact character of all of the numerous withdrawals during any one year can be made therefrom.

In preparing the petitioner's income tax return for each of the years in controversy, the bookkeeper examined each item entered in the journal for the taxable year and made his determination of the character of the item. He then transferred the deposit items to his work sheets under headings such as deposits from the betting business, rents and dividends, respectively, and he similarly transferred the withdrawal items under headings for various business expenses and various personal expenses, respectively. As a result he secured a column showing the items and the total deposits of what constituted his determination of the gross deposits from petitioner's wagering business and a column showing the items and the total withdrawals of what constituted his determination of the deductible expenses of that business. The difference between those two totals represented his calculation of petitioner's gain or loss from his business of accepting wagers. In his income tax returns for 1929 and 1930 the petitioner reported as "income from racing transactions" the gain calculated by his bookkeeper in the amounts of $3,500 for 1929 and $3,100 for 1930. In his income tax return for 1931 petitioner did not

report either a gain or a loss from such source because his book-keeper's calculations showed a loss from betting transactions for that year. The petitioner did not attach to his return for each or any of those years a schedule of his gross receipts and expenses of his betting transactions.

A letter dated on or about the 1st of February 1931 requested the petitioner to bring his records for the year 1929 to the office of the revenue agent in charge of the third New York district. In reply the petitioner, by letter dated February 5, 1931, stated that his records for that year were at his office and that he desired to have them examined at that place. The request by a taxpayer for a field audit is not unusual and the records in the office of the revenue agent in charge show that petitioner's return for 1929 was thereafter transferred to the field audit division. No field audit was made at that time.

In or about April 1932 revenue agent Hussey made a routine examination of petitioner's return for 1930 and in connection therewith he made a so-called spot check of petitioner's bank statements and journal for that year. His report stated that petitioner's income of $3,100 from racing transactions, as shown on the return, "was verified from the check book and found correctly reported." He recommended an overassessment of $32.08 on account of an adjustment in petitioner's income from rents.

Subsequent to the receipt in 1932 of a refund check for $32.08 for the year 1930, the petitioner considered that the Commissioner was satisfied as to the correctness of his income tax returns for both of the years 1929 and 1930 and he thought that there would be no occasion for further use of his 1929 and 1930 journals, which he had retained solely for income tax purposes. He thereupon destroyed the journal and the bookkeeper's work sheets for each of those years because they pertained to a business which was illegal in New York State during those years.

In October of 1932 revenue agent Weisel made an investigation of petitioner's returns for the years 1929, 1930, and 1931, because in the course of his work on another case he had secured information as to the payment of large sums of money to petitioner. At that time petitioner's records for 1929 and 1930 had been destroyed and his records for 1931 had been misplaced and could not be found. Through bank records the agent secured information as to all of petitioner's bank deposits for each of the years 1929, 1930, and 1931 and he eliminated all items ascertained, through this and other information obtained, to represent deposits of funds received from sources other than petitioner's betting transactions. Then, upon the basis that all unexplained bank deposits represented petitioner's gross income from his wagering transactions and, further, from the experi-

ence and knowledge he had gained as a revenue agent in determining income from bank deposits in a number of other similar cases, revenue agent Weisel determined that 5 percent thereof would constitute a reasonable net return from the petitioner's gross income from betting transactions. The agent determined that petitioner's bank deposits, or gross income from his betting transactions, amounted to $2,442,500.37 for 1929, $2,273,854.50 for 1930, and $1,308,942.68 for 1931, and that petitioner derived taxable net income from his betting transactions in the amounts of $121,125.02 for 1929, $113,692.72 for 1930, and $65,447.10 for 1931, and submitted a report to that effect. Thereafter, the petitioner's journal for 1931 was found and submitted to the revenue agent in charge. Agent Weisel examined the journal and finding that it purported to be a complete record of all of petitioner's racing transactions for 1931 and accounted for large sums of money paid to petitioner in that year, he reconsidered the taxable year 1931 upon the basis of the journal entries for that year, determined petitioner's taxable net income from racing transactions to be $22,787.79 instead of $65,447.10, determined his income tax liability to be $1,672.58 for 1931, and submitted a report to that effect.

The petitioner's bookkeeper was unable to locate his original work sheets made from the 1931 journal upon which the return for that year was based, which sheets showed a loss from racing transactions for that year. For the purpose of this proceeding the bookkeeper made up another set of work sheets from the 1931 journal in the same manner he had theretofore done for that and other years in connection with the preparation of petitioner's income tax returns. The result of his calculations showed gross deposits from racing transactions in the amount of $1,222,719.67; total withdrawals of $1,222,636.06, representing expenses pertaining to that business, and a net income of $83.61 from such business without deducting the estimated expense of an automobile used to transport petitioner and several of his employees to and from the race tracks and the salary of a chauffeur hired only during the racing season.

In asserting the deficiencies and penalties in controversy the respondent determined that petitioner had net income from racing transactions in the amounts of $121,125.02 for 1929 and $113,692.72 for 1930, as "net bank deposits considered business income" and $22,787.79 for 1931 as "income from business" based on the report of revenue agent Weisel.

The charge of fraud is regarded as a serious matter. Fraudulent intent and acts on the part of a taxpayer are never presumed and the ordinary preponderance of evidence is not sufficient to establish fraud. The respondent's burden of establishing as a fact that the petitioner herein filed false and fraudulent tax returns with the intent to evade his income taxes for the years 1929, 1930, and 1931

must be met by clear and convincing evidence. *Charles J. Delone*, 34 B. T. A. 1139; *Doric Apartment Co.*, 32 B. T. A. 1187; *Henry S. Kerbaugh*, 29 B. T. A. 1014; affirmed per curiam, 74 Fed. (2d) 749; *J. William Schultze*, 18 B. T. A. 444.

There is no evidence of deliberate omissions of income which the petitioner knew he had received. For each of the years involved petitioner kept a record of his betting transactions and from such records his bookkeeper calculated petitioner's income from such business, which income was duly reported. In our opinion, the bookkeeper made his calculations honestly and according to his best judgment on the information before him. Under the circumstances disclosed by this record, the disparity between the amount of taxable income determined by respondent for each of the years in controversy and the amount of taxable income for 1929 and 1930 and a loss for 1931, determined by petitioner's bookkeeper, is not evidence of fraud, for there existed a considerable latitude for reasonable differences of opinion between the petitioner and respondent as to certain basic facts. Cf. *Doric Apartment Co., supra.* The principal differences of opinion related to the question of the proper deductions on account of the expenses incurred in the petitioner's business of accepting wagers and the petitioner's method of accounting clearly shows a basis for honest differences of opinion as to what items may have constituted proper deductions. The petitioner's failure to attach to his returns a schedule of his gross income and claimed deductions from racing transactions, and also his destruction of his records for the years 1929 and 1930, have been, in our opinion, sufficiently and reasonably explained so that we do not regard those acts as indicating an intention to defraud.

We conclude and find as a fact that the petitioner did not file false and fraudulent income tax returns with the intent to evade tax for either of the years 1929, 1930, or 1931. The respondent erroneously asserted fraud penalties for each of those years.

The next question for our determination is presented by petitioner's plea of the bar of the statute of limitations as to all three years in controversy.

Petitioner's return for the year 1929 was duly filed on March 11, 1930, reporting a net taxable income of $13,426.51 and an income tax liability of $165.77. No waiver for the year 1929 has been executed. The two-year period of limitation upon assessment, as provided by section 275 (a) of the Revenue Act of 1928, had expired prior to the mailing of the deficiency notice on June 30, 1934, and also it had expired prior to the assessment on November 11, 1933, of a portion of the deficiency in the amount of $2,473.20 for 1929. Accordingly, there is no deficiency for the year 1929 and there is an overassessment in the amount of $2,473.20 for that year.

Upon the granting of an extension of time for filing a return for 1930, it was duly filed by petitioner on March 28, 1931, reporting a net taxable income of $11,641.96 and an income tax liability of $164.33. Within two years of the filing of such return and under date of January 27, 1933, the petitioner and the Commissioner executed a waiver providing that any income taxes due from petitioner for 1930 might be assessed at any time on or before June 30, 1934. Assessment of the asserted deficiency for 1930 was not barred at the time the deficiency notice was mailed on June 30, 1934, and since that date the running of the statute of limitations has been suspended during the pendency of this proceeding by operation of section 277 of the Revenue Act of 1928. The assessment on November 11, 1933, of $2,277.74 of the asserted deficiency for 1930 was timely made.

Petitioner's return for the year 1931 was filed sometime between January 28 and March 15, 1932, reporting no taxable net income and no income tax liability. Within two years from such filing of that return the respondent made an assessment on November 11, 1933, of additional income taxes in the amount of $1,672.58, which is the deficiency for 1931 embraced in the deficiency notice mailed on June 30, 1934. Pursuant to section 276 (c) of the Revenue Act of 1928, such asserted deficiency, having been assessed within the period of limitation, may be collected at any time within six years after assessment, and the collection of the asserted deficiency was not barred at the time of the mailing of the deficiency notice. Pursuant to section 277 of the Revenue Act of 1928, the running of such six-year collection period has been suspended during the pendency of this proceeding.

The last issue is on the merits and involves petitioner's assignment of error in the respondent's determination that petitioner had income from racing transactions in excess of that reported on his tax returns for the three years in controversy. The petitioner has the burden of establishing error in the amount of the deficiencies determined by respondent. *Welch* v. *Helvering*, 290 U. S. 111; *Old Mission Portland Cement Co.* v. *Helvering*, 293 U. S. 289.

Since the assessment and collection of any additional income tax for the year 1929 is barred by the statute of limitations, we need not consider this case on the merits as to that year.

As to both of the years 1930 and 1931, the respondent's determination of the amount of petitioner's taxable income from his betting transactions is prima facie correct and the testimony and evidence adduced by petitioner is not sufficient to establish error.

The fact that petitioner's records for the year 1930 have been destroyed is unfortunate, but that circumstance does not relieve the petitioner of his burden of proof. Cf. *Burnet* v. *Houston*, 283 U. S. 223; *Pennant Cafeteria Co.*, 5 B. T. A. 293. The testimony of the

bookkeeper that he correctly calculated petitioner's net income from racing transactions for that year and that as so calculated it was correctly shown in the return does not establish the correctness thereof or error in the Commissioner's determination, for the calculations of the bookkeeper were based upon his determination of what receipts constituted gross income from petitioner's betting business and his determination of what expenditures constituted deductible expenses of that business.

To determine petitioner's net taxable income from his betting transactions the respondent has, in the absence of any accounting records for 1930, resorted to the method of using 5 percent of petitioner's total bank deposits, after eliminating therefrom certain deposits ascertained not to represent income. Such method, in effect, allows petitioner a deduction of 95 percent of gross income as the ordinary and necessary expenses of that business. In numerous prior cases involving analogous facts and circumstances, this Board has approved the respondent's use of such method in arriving at a taxpayer's net taxable income.[1] The petitioner has failed to establish error in the respondent's determination of the amount of his gross income from betting transactions or the amount allowed by respondent as a proper deduction therefrom for the year 1930. Accordingly, upon failure of proof, the deficiency determined by the respondent for 1930 must be sustained.

For the year 1931 the petitioner submitted in evidence the journal in which is recorded the bank deposits and withdrawals pertaining to his betting transactions and also deposits of income from other sources and withdrawals for petitioner's personal use. Based upon an examination of such journal and his determination therefrom that petitioner's taxable net income from betting transactions amounted to $22,787.79, the respondent determined the deficiency in controversy for 1931. The petitioner has failed to show any specific errors in such prima facie correct determination. Petitioner has submitted in evidence his bookkeeper's so-called work sheets, comprising about 21 pages, made up from the journal from which petitioner calculated his taxable net income from betting transactions to be $83.61. However, those work sheets do not establish error in the respondent's determination for they are merely the bookkeeper's calculations based upon (1) his own determination of what deposits constituted gross income derived from the petitioner's betting transactions, and (2) upon his own determination of what withdrawals

[1] *Yorkville Live Poultry Co., Inc.*, 18 B. T. A. 47; *Julius Gann*, 15 B. T. A. 594; affd., 39 Fed. (2d) 73; *Moses P. Ginzburg*, 14 B. T. A. 324; *I. Goldman*, 12 B. T. A. 874; *Fellipo Dicenso*, 11 B. T. A. 620; *F. G. Bishoff*, 6 B. T. A. 570; affd., 27 Fed. (2d) 91; *M. Cohen*, 5 B. T. A. 240; *E. Muelhoefer & Son*, 4 B. T. A. 586; *Benjamin Colitz*, 3 B. T. A. 947; and *Jacob Roffwarg*, 2 B. T. A. 332.

constituted deductible expenses of the business. The mere conclusion of the bookkeeper so reached, that certain amounts entered in the journal constituted proper deductions as business expenses, is not proof of the deductibility of such amounts. Even if the Board should assume the function of making an audit of the journal, such an audit would not clearly reflect petitioner's income so as to enable us to determine whether petitioner had made gains, or sustained losses in 1931, because an examination of the journal discloses entries the character and purpose of which are not explained in the bookkeeper's description of the method used in keeping the journal, or otherwise. Accordingly, upon failure of proof, the deficiency determined by respondent for the year 1931 must be sustained.

*Decision will be entered under Rule 50.*