John W. Snow, Jr. v. Commissioner.
John W. Snow, Jr. v. Commissioner
Docket No. 30121.
United States Tax Court
1953 Tax Ct. Memo LEXIS 64; 12 T.C.M. (CCH) 1281; T.C.M. (RIA) 53358; November 10, 1953
*64 Respondent reconstructed petitioner's income by the increase in net worth method and determined deficiences and negligence penalties for 1946, 1947, and 1948. Held: 1. Respondent's use of the net worth method was proper and not arbitrary. 2. On the record, a cash sum in excess of $20,000 was earned during 1946, 1947, and 1948 and did not, as petitioner contended, constitute fire insurance proceeds collected by him in 1931 and held in his daughter's safe deposit box. 3. The gain realized on the trade-in of a Ford was nonrecognizable under Sec. 112(b)(1), I.R.C., because derived from exchange of property of like kinds held solely for productive use in petitioner's business. 4. As a result of adjustments in respondent's computations of petitioner's income the deficiency determined for 1946 is excessive, but the deficiencies for 1947 and 1948 are lower than could have been determined. However, greater deficiencies for 1947 and 1948 cannot be adjudged because respondent asserted no claim therefor. 5. Negligence penalties were properly imposed. Eugene E. Gilmer, Esq., 506-7 Frank Nelson Building, Birmingham, Ala., for the petitioner. D. Louis Bergeron, Esq., for the respondent. BLACK *65 Memorandum Findings of Fact and Opinion The Commissioner has computed petitioner's income for the taxable years 1946, 1947, and 1948 by application of the so-called "net worth increase" method. He has determined deficiencies in petitioner's income taxes for those years and has added negligence penalties, as follows: 5% Negligence
Year
Deficiency
Penalty
1946
$ 570.54
$28.53
1947
1,381.67
69.08
1948
1,628.50
81.43
Petitioner contends that the Commissioner erred in disregarding petitioner's method of reporting income and arbitrarily determining that income by the net worth method. Petitioner further contends that, even if the Commissioner's utilization of the net worth method was proper in this case, the Commissioner erred in its application in the following particulars: (1) failure to include at least $20,000 in cash in petitioner's assets as of December 31, 1945, which sum increased to at least $21,712 as of December 31, 1947; (2) failure to include $11,250 in United States Government Series E Bonds in petitioner's assets as of December 31, 1945, and $6,750 of said bonds in his assets as of the close of each of the tax years in issue; and (3) commission of numerous minor errors in the determination *66 of petitioner's assets and liabilities for the periods involved. Petitioner also contests the Commissioner's determination of negligence penalties for 1946, 1947, and 1948. Findings of Fact Petitioner is a physician and surgeon presently residing in Graysville, Alabama. During the three tax years in question he resided in Palos, Alabama, and filed returns for those years with the Collector of Internal Revenue for the District of Alabama. Petitioner is married to Florence Snow. They have three children, Florence Snow was regularly employed during the tax years involved and filed separate income tax returns for those years. Petitioner was engaged in the practice of medicine in Palos from 1907 through 1949. He was employed as company doctor by several corporations and, for the years here pertinent, was company doctor for Adams, Rowe & Norman, a coal mining corporation. The corporation deducted from $1.50 to $2.00 per month from the wages of each employee and remitted that amount to petitioner. In return petitioner treated the employees and their families for all except certain types of cases specified in his contract with the corporation. Petitioner himself dispensed the drugs he prescribed *67 for the corporation patients, sometimes on credit, and occasionally loaned money and supplied merchandise to those patients. A tally of these transactions was submitted to the corporation which then deducted the amounts due petitioner from its employees' salaries and paid those amounts to the petitioner. Petitioner conducted a successful private practice in addition to the arrangement he had with Adams, Rowe & Norman. In 1930, petitioner's clinic was destroyed by fire. He recovered on an insurance policy applicable thereto and used the proceeds to construct a combined residence and clinic. This too, however, burned down around 1931. Thereafter he conducted his practice in offices which Republic Steel Co. permitted him to use rent free. Petitioner received insurance proceeds to compensate him for the loss resulting from the second fire. He claims that he did not spend those proceeds until 1949, when he purchased United States Government Series G Bonds therewith. He states that during the tax years involved the money was kept by his daughter, Helen Snow Silver, sometimes hereinafter referred to as Helen, in a safe deposit box maintained in the name of a firm she and her husband own. *68 Therefore, he contends, that money should have been included in respondent's computation of petitioner's assets as of December 31, 1945, and did not represent income received in any of the taxable years. In 1936, petitioner borrowed $3,110 on a life insurance policy in order to make an appeal bond in a suit in which he was then involved. Although friends offered to loan him the money petitioner stated that he obtained it by borrowing on his policy because "that sum was available without disturbing anything or anybody." The loan was subsequently repaid. Between 1941 and 1945, the petitioner expended $11,250 for United States Government Series E Bonds with an aggregate redemption value at maturity of $15,000. On July 9, 1946, internal revenue agent Stephen J. Sullivan interviewed the petitioner at Palos in connection with an investigation of petitioner's returns for the years 1942 through 1945. The interview was discontinued when petitioner complained that he was not feeling well. Sullivan wished to meet the petitioner on July 10 in order to inspect the contents of a safe deposit box petitioner maintained at the First National Bank in Birmingham, Alabama. Petitioner, however, stated *69 that he had another appointment in Birmingham on the 10th, so Sullivan agreed to meet him on July 11. Sullivan discovered, on July 11, that petitioner had opened his safe deposit box in the First National Bank on the preceding day, July 10. Petitioner explained that he had removed two $1,000 bills from the box on July 10 and a closed package, the contents of which were unknown to him since it belonged to his daughter Helen. Petitioner also stated that he frequently held other people's property in his box, as a personal favor, but did not specifically identify any of the alleged depositors. Petitioner asserted that the only bank he dealt with was the main branch of the aforementioned First National Bank and never mentioned that he had $20,000 in cash in Helen's box or elsewhere. As a result of the above investigation deficiencies totaling $5,753.51 were assessed against petitioner which he paid by check dated July 25, 1946. Almost all the funds to cover that check were obtained by cashing in Series E Bonds for which he had paid $4,500 between 1941 and 1945. The redemption value of those bonds at the time he cashed them cannot be determined from the record, particularly since petitioner *70 failed to report his gain thereon as income from interest in his 1946 return. Following that transaction petitioner still possessed Series E Bonds for which he had paid a total of $6,750 between 1941 and 1945, and those bonds were held by him throughout 1946, 1947, and 1948. On April 19, 1946, petitioner loaned $6,000 to Helen and her husband to be used by them toward the purchase of a house. The loan was subsequently repaid. In January 1948, petitioner traded for a new Ford, an old Ford automobile which he used for business purposes but was not held by him as stock in trade or primarily for sale. He had already fully depreciated the old Ford for income tax purposes. The purchase price of the new Ford was $1,690.55. He was allowed $1,045 on his old car and paid, in addition, $645.55 in cash. The $1,045 constitutes a gain to petitioner, but one resulting from exchange of property of like kinds held for productive use in petitioner's business. Petitioner, sometime in 1948, also sold, for $1,000, a 1942 Packard automobile which he owned for over six months and fully depreciated for income tax purposes prior to the sale. He used that car in his business, it was not property of a kind that *71 would properly be includible in his inventory, and it was not held by him primarily for sale to customers in the ordinary course of his business. The $1,000 gain thus realized was, therefore, properly regarded by respondent as derived from the sale of a capital asset held for more than six months. In April 1949, petitioner and Helen each contributed $25,000 toward the purchase of $50,000 Series G Bonds. The bonds were taken out jointly in the names of petitioner and Helen. In November 1949, internal revenue agent Horace W. Weissinger began investigating petitioner's returns for the taxable years 1946 through 1948. Those returns were prepared for petitioner by deputy collectors of internal revenue on the basis of written and oral information supplied them by petitioner. Adjusted gross income was reported in those returns as follows: Adjusted Gross
Year
Income
1946
$6,117.96
1947
4,904.79
1948
4,652.36
We find as a fact that petitioner did not keep or maintain adequate records to support the entries made in those tax returns. The only supporting data petitioner gave Weissinger were cancelled checks and bank statements relating to a joint account in the First National Bank of Birmingham. That *72 account, which was active during all the years here involved, was in the name of "Mrs. John W. Snow, Jr., M.D." and either petitioner or his wife could withdraw money therefrom by signing that name. There is no evidence touching on the amount of money, if any, which was contributed to that joint account by petitioner's wife and we, therefore, conclude that all the money deposited therein originated with petitioner. Weissinger also determined the balances in a savings account petitioner maintained at the First National Bank and discovered, in petitioner's safe deposit box at that bank, $2,380 in cash and nine $1,000 (redemption value) Series E Bonds purchased between 1941 and 1943. Petitioner told Weissinger about the $50,000 in Series G Bonds which he and Helen purchased and claimed that he had one other $1,000 Series E Bond. Petitioner further stated that the only safe deposit box he had was in the First National Bank. He failed to state that he had ever used Helen's box. Because of the aforementioned lack of records the correctness of petitioner's returns could not be determined. Weissinger, therefore, reconstructed petitioner's income for the years 1946 through 1948 by use of the *73 net worth method. That method involves arriving at income for a taxable year by finding the difference between the taxpayer's net assets at the beginning and end of the particular year and adding thereto the taxpayer's nondeductible expenditures for that year. Assets and liabilities which remained constant throughout the period were not included in Weissinger's calculations since they would have no effect thereon. Weissinger's calculations upon which the respondent based his deficiency determinations are as follows: [1] *74 As of December 31, ASSETS:
1945
1946
1947
1948
Mrs. John W. Snow, Jr., M.D. - checking
account
$1,203.04
$ 650.37
$ 1,329.73
$ 1,261.72
John W. Snow - savings account
6,150.54
6,243.25
6,274.46
6,337.35
Cash on hand (used to purchase G Bonds
in 1949)
9,500.00
17,000.00
25,000.00
Ford automobile
1,690.55
Office refrigerator
169.00
169.00
Total assets
[2] $7,353.54 $16,393.62
$24,773.19 [5] $33,458.62 LIABILITIES: [3] Comparative reserve for depreciation 1,790.00
2,780.00
3,980.00
Net worth
$7,353.54
$14,603.62
$21,993.19
$29,478.62
Increase
$ 7,250.08
$ 7,389.57
$ 7,485.43
PLUS: [4] Personal expenses paid by check 987.38
1,476.15
4,896.00
Income tax paid in cash
1,074.14
$ 8,237.46
$ 9,939.86
$12,381.43
LESS: Adjustment for 1/2 gain on sales of Pack-
ard and old Ford, and for tax refund
1,140.00
Corrected adjusted gross income
$ 8,237.46
$ 9,939.86
$11,241.43
Adjusted gross income reported by peti-
tioner
6,117.96
4,904.79
4,652.36
Additional taxable income
$ 2,119.50
$ 5,035.07
$ 6,589.07 The $25,000 used for the purchase of Series G Bonds in 1949 was allocated as earnings over the three taxable years in proportion to the receipts (exclusive of that $25,000) reported by petitioner in his returns for those years. We find, considering the record as a whole, that that sum was actually earned by petitioner during that period and was not reported as income by him. The money was not, as petitioner claims, in large part insurance proceeds received by him in 1931. Furthermore, the aforementioned method of allocation of those earnings over the three years in issue is, *75 under the circumstances, reasonable and proper and, we think, accurately reflects petitioner's earnings for those years. It was stipulated at the hearing that outstanding checks drawn on the "Mrs. John W. Snow, Jr., M.D." account were not taken into consideration by Weissinger in listing the closing balances in that account. The parties agree, and we so find, that the correct balances in that account, as of December 31, were as follows: Year
Balance
1945
$ 988.17
1946
166.85
1947
1,041.37
1948
997.01
The facts indicate that another correction in Weissinger's computation is necessary. In determining petitioner's adjusted gross income for 1948, a $1,140 adjustment was made for one-half the gain on the sales of the Packard and old Ford, and for a tax refund. As mentioned above petitioner's gain on the 1948 trade of his oldford for a new one was $1,045. Weissinger obviously recognized that gain and included half of it, or $522.50, in the adjustment on the theory that the trade involved the sale of a capital asset held for over six months. [6] We find, however, that the trade constituted an exchange of property (the old Ford) held for productive use in petitioner's business (but not as stock in trade *76 or primarily for sale), for property of a like kind (the new Ford) which was put to the same use. Therefore, no portion of the gain realized on the transaction should have been recognized. [7] In view of our holding in this respect, respondent's adjustment for 1948, which reads: "Adjust for 1/2 Auto Sales [Packard and old Ford] & Tax Refund, $1,140.00" should be changed to $1,662.50. This means that no profit is to be included for the exchange of the old Ford. Prior to such an adjustment $522.50 was included. Taking into account the above corrections, and correcting the $1,000 mathematical error in addition of petitioner's assets for 1948, we find that the following is the proper statement of petitioner's net worth and taxable income for the years involved: As of December 31,
ASSETS:
1945
1946
1947
1948
Mrs. John W. Snow, Jr., M.D. - checking
account
$ 988.17
$ 166.85
$ 1,041.37
$ 997.01
John W. Snow - savings account
6,150.54
6,243.25
6,274.46
6,337.35
Cash on hand (used to purchase G bonds
in 1949)
9,500.00
17,000.00
25,000.00
Ford automobile
1,690.55
Office refrigerator
169.00
169.00
Total assets
$7,138.71
$15,910.10
$24,484.83
$34,193.91
LIABILITIES: Comparative reserve for depreciation
1,790.00
2,780.00
3,980.00
Net worth
$ 7,138.71
$14,120.10
$21,704.83
$30,213.91
Increase
$ 6,981.39
$ 7,584.73
$ 8,509.08
PLUS: Personal expenses paid by check
987.38
1,476.15
4,896.00
Income tax paid in cash
1,074.14
$ 7,968.77
$10,135.02
$13,405.08
LESS: Adjustment for 1/2 gain on sale of Pack-
ard, full gain on trade of Ford and tax
refund
1,662.50
Corrected adjusted gross income
$ 7,968.77
$10,135.02
$11,742.58
Adjusted gross income reported by peti-
tioner
6,117.96
4,904.79
4,652.36
Additional taxable income
$ 1,850.81
$ 5,230.23
$ 7,090.22
*77 The deficiency determined by respondent for 1946 is based upon income greater than that shown in the preceding statement. The deficiencies determined by respondent for 1947 and 1948 are based upon income lower than that shown in the preceding statement. We find that the petitioner was negligent in reporting his income and intentionally disregarding respondent's regulations requiring him to keep proper records. Subsequent to his receipt of the deficiency notice in the instant case the petitioner paid $4,217.23 of the deficiencies, penalties, and interest determined therein to the Collector of Internal Revenue for the District of Alabama. Opinion BLACK, Judge: When a taxpayer does not regularly employ a method of accounting or if the method of accounting employed by him does not clearly reflect his income, the respondent may resort to the net worth method of computation of such income. [8] As we said in Louis Halle, 7 T.C. 245, 250, affd. 175 Fed. (2d) 500 (C.A. 2), certiorari denied 338 U.S. 949: "The Commissioner need not accept, as complete, correct, and accurate, the returns filed or the sworn statement of the taxpayer that his returns completely and correctly disclose his tax *78 liability. The Commissioner has authority to check the returns against the records of the taxpayer and, if no records have been kept or the records are incomplete, inaccurate, or otherwise unsatisfactory, he may seek information elsewhere to discover, assess, and collect the full tax liability imposed by law." * * * See also Bishoff v. Commissioner, 27 Fed. (2d) 91 (C.A. 3). Petitioner here failed to produce, either upon request of the internal revenue agent who examined his returns or at the hearing, any records (other than canceled checks and bank statements) to substantiate his returns. Nor were records shown to support petitioner's statement *79 as to the origin of the $25,000 used to purchase the Series G Bonds in 1949. Respondent, therefore, was justified in resorting to the net worth method to determine petitioner's income and tax liability. Respondent's determination of deficiencies based upon that method is prima facie correct and the burden of proving it erroneous rests upon petitioner. J. V. Moriarty, 18 T.C. 327. Petitioner contends that he has successfully carried his burden of proof by showing respondent's determination to be so incorrect as to be arbitrary and excessive and, therefore, invalid in its entiretly. To support this contention petitioner cites Helvering v. Taylor, 293 U.S. 507, and cases following that decision. In Helvering v. Taylor, the Court said that the taxpayer need go no further to sustain his burden of proof than showing that the Commissioner's determination is incorrect. The taxpayer need not, in addition, prove the correct amount that lawfully might be charged against him. However, continued the Court, the taxpayer may still be held liable for taxes if "his evidence was sufficient also to establish the correct amount that lawfully might be charged against him." The record in the instant *80 case reveals that although petitioner has proved respondent's computation to be incorrect in some respects, the evidence petitioner adduced also establishes the correct figures and the resulting tax liability. Furthermore, since respondent's determinations were in the main based on inferences properly drawn from the facts proved by the evidence they cannot, even though incorrect in some respects, be declared "arbitrary" and as a consequence totally invalid. Hague Estate v. Commissioner, 132 Fed. (2d) 775 (C.A. 2), certiorari denied, 318 U.S. 787. Petitioner's contention, therefore, cannot be sustained. We next consider certain specific items entering into respondent's computation of petitioner's net worth and income for the years involved. The correct balances in petitioner's joint checking account at the end of the years 1945 through 1948, were stipulated at the hearing and we have so found in accordance with that stipulation. Those balances differed from the ones listed in respondent's computation because respondent failed to consider checks drawn on that account which were outstanding at the close of each of the years. Petitioner urges that respondent erred in failing to list *81 the $11,250 in Series E Bonds (purchased between 1941 and 1945) as an asset as of December 31, 1945, and in failing to list $6,750 of those bonds as assets held at the close of 1946, 1947, and 1948. Petitioner redeemed $4,500 (plus accrued interest) of those bonds in 1946 to be used to satisfy most of a $5,753.51 income tax deficiency determined against him following investigation of his returns for the years 1942 through 1945. The $5,753.51 expenditure likewise was not taken into account in respondent's calculations for 1946. These omissions by respondent worked in petitioner's favor and petitioner cannot, therefore, be heard to complain. The reduction in petitioner's net worth in 1946, resulting from the $4,500 decrease in bond holdings, was more than offset by the nondeductible expenditure of $5,753.51 paid to settle his aforementioned income tax liability. Consequently, had both items been taken into account, respondent's statement would show greater income for petitioner in 1946. Moreover, the exclusion of the $6,750 balance of bonds from the asset listings for 1946 through 1948 was merely for convenience sake. Since those bond holdings were constant from the close of 1946 through *82 1948, inclusion in the asset listings for those years would have no effect on computations endeavoring to show changes in net worth for that period. Petitioner next urges that respondent erred in his treatment of the trade of petitioner's old Ford for a new one in January 1948. As stated in our Findings of Fact petitioner realized a $1,045 gain on that transaction resulting from the fact that his old Ford, upon which the vendor allowed him that amount, had already been fully depreciated for tax purposes. Respondent recognized the full $1,045 gain, treated the trading of the old Ford as the sale of a capital asset held for more than six months, and deducted one-half of that gain ($522.50) from petitioner's gross income. [9] However, we have found, as petitioner urges, that the transaction constituted an exchange under section 112 (b) (1) of the Code of property of like kinds "held for productive use in trade or business * * * (not including stock in trade or other property held primarily for sale * * *)." [10] Consequently, none of petitioner's $1,045 gain may be recognized. W. H. Hartman Co., 20 B.T.A. 302; I.T. 2573, X-1, C.B. 215; see also Thomas Goggan & Bros., 45 B.T.A. 218; National Outdoor Advertising Bureau, Inc., v. Helvering, 89 Fed. (2d) 878 *83 (C.A. 2). See also Treasury Regulations 111, section 29.112 (b)(1)-1. Petitioner maintains that respondent erred in determining that the $25,000 with which petitioner purchased Series G Bonds in April 1949, was earned during the three taxable years in question. Petitioner states that at least $20,000 of that sum was acquired prior to 1946, and that an additional $1,712 was accumulated by the end of 1947. He explains that the money represented insurance proceeds collected when an office and residence built by him burned down in 1931. He states that he first put the money *84 in his sister's custody and then in the custody of his daughter Helen. He claims that he permitted his family (consisting of three children, seven sisters, and four brothers) to borrow it as needed from time to time, without interest. The money was always replaced but he kept no record of the loans and could not testify as to any particular transactions. In 1949, said the petitioner, Helen advised him to put the money into Government bonds in order to get income from it. Helen testified that she kept petitioner's money in a safe deposit box maintained in the name of Silver & Douce Co., a company of which her husband was president and she was vice-president, secretary, and treasurer. Money of Silver & Douce Co. was also kept in that box. The money which petitioner gave her was in envelope and she did not count it when it was given to her nor did she know how much was there until she took it out of the box in 1949 to buy the G bonds. She testified that she did not know what was to happen to petitioner's money in the event petitioner died while it was still in her safe deposit box. We are not required to believe petitioner's and Helen's testimony, even if it be uncontradicted, if it appears *85 inherently improbable or manifestly unreasonable. Carmack v. Commissioner, 183 Fed. (2d) 1 (C.A. 5), certiorari denied 340 U.S. 875; Boyett v. Commissioner, 204 Fed. (2d) 205 (C.A. 5). It does, in fact, appear improbable to us that petitioner would give Helen such a large sum of money merely to be placed in her safe deposit box when he himself maintained such a box. Petitioner, a member of the medical profession and presumably an educated man, apparently would have us believe that for over 17 years, until his daughter advised him, he failed to realize that that large sum of money would be put to better use if invested in bonds which yielded an income. It seems strange to us, moreover, that Helen never counted the money petitioner allegedly entrusted to her until 1949, even though she placed it in a box with funds not belonging to petitioner and the money supposedly was loaned to relatives from time to time; that nothing was said regarding the disposition of the money in the event of petitioner's untimely death; and that no record of loans of the money was kept by petitioner. The above considerations, coupled with the fact that petitioner's credibility is subject to question in *86 view of his income tax derelictions for the years 1942 through 1945, Rogers v. Commissioner, 111 Fed. (2d) 987, (C.A. 6) alone convince us that petitioner's explanation of the source of the over $20,000 is not plausible. However, we wish to point out several other factors which make it impossible to give credence to petitioner's story: (1) In 1936, petitioner borrowed $3,110 against a life insurance policy in order to make an appeal bond in a suit in which he was then involved. He obtained the money that way rather than by borrowing from his friends because, as he stated, "that sum was available without disturbing any thing or anybody." (2) On July 11, 1946, petitioner told the internal revenue agent who was investigating his returns for 1942 through 1945 that he had just removed two $1,000 bills from his safe deposit box and a package which belonged to Helen; that the only bank he dealt with was the one in which that box was located; and that he frequently held other people's property in that box as a personal favor. Petitioner did not mention that he owned any other assets. (3) In order to pay the $5,753.51 income tax deficiency assessed against him for the tax years 1942 through *87 1945, petitioner found it necessary, in 1946, to redeem $4,500 (plus interest) of Series E bonds he had purchased from 1941 through 1945. (4) Petitioner, in 1949, failed to provide the investigating internal revenue agent with any books or records (other than canceled checks and bank statements) to substantiate his returns for 1946 through 1948, stated that he had only one safe deposit box, and never mentioned that he had ever used Helen's box. It is obvious that the above facts are indicative of a course of conduct inconsistent with petitioner's contention. A man who has over $20,000 in cash lying dormant would not ordinarily borrow on insurance policies or redeem Government bonds to meet financial demands that easily could be satisfied from such sum. Nor would he normally keep that cash in another's safe deposit box when he has a box of his own and finds it no inconvenience even to hold other people's property in that box. In addition, there arises a justifiable inference that all the assets he had in 1946 were those revealed to the investigating revenue agent in that year, especially since it would not be to his disadvantage to mention the $20,000 if, as alleged, it constituted *88 fire insurance proceeds collected in 1931. A consideration of the record, therefore, leaves us with no doubt of the correctness of respondent's determination that petitioner earned the entire $25,000 during the period in issue. We have found that as a fact. Respondent allocated the $25,000 as earnings over the taxable years 1946 through 1948, in proportion to the receipts (exclusive of that $25,000) reported by petitioner in his returns for those years. This appears to us a reasonable and proper method of allocation where, as here, petitioner had produced no records indicating otherwise and has provided no reliable guides. Cf. Andrew P. Solt, 19 T.C. 183, 188; Cohan v. Commissioner, 39 Fed. (2d) 540, 544. The burden of proving that respondent's allocation was erroneous or arbitrary and without basis is upon petitioner. He has here made no showing to that effect. Respondent determined that petitioner's adjusted gross income for each of the years involved (upon which respondent based his deficiency determination) was as follows: Year
Income
1946
$ 8,237.46
1947
9,939.86
1948
11,241.43
We have found, however, that petitioner's correct adjusted gross income for each of those years was as follows: *89 Year
Income
1946
$ 7,968.77
1947
10,135.02
1948
11,742.58
The corrected income figure for 1947 is higher despite the reduction in petitioner's checking account balances because the balances for 1947 was not reduced as much as the 1946 balance. The corrected 1948 income figure is higher even though we treated all the gain on the trade of petitioner's Ford as nonrecognizable because respondent made a mathematical error of $1,000 in adding petitioner's assets, which we have corrected. We may recognize this mathematical error as offsetting the reductions adjudged in respondent's calculations for 1948, even though no mention of it was made in the pleadings or at the hearing. Houston Lighting & Power Co. v. Commissioner, 34 B.T.A. 745, appeal dismissed (App. D.C.) June 16, 1937; Standard Oil Co. v. Commissioner, 43 B.T.A. 973, affd. 129 Fed. (2d) 363 (C.A. 7), certiorari denied 317 U.S. 688; John I. Chipley, 25 B.T.A. 1103. However, despite our finding that petitioner's income for 1947 and 1948 was greater than that upon which respondent based his deficiency determinations, we may not in this decision adjudge deficiencies greater than those asserted in respondent's deficiency notice since *90 no claim therefor was made by respondent in a proper pleading. Section 272 (e), Internal Revenue Code; Moise v. Burnet, 52 Fed. (2d) 1071 (C.A. 9); Lucinda Pitman, 24 B.T.A. 244, reversed on other grounds, 64 Fed. (2d) 740 (C.A. 10); see also Davison v. Commissioner, 60 Fed. (2d) 50 (C.A. 2); and compare Helvering v. Edison Securities Corp., 78 Fed. (2d) 85 (C.A. 4). Petitioner argues in his brief that he maintained adequate records to substantiate his returns for 1946, 1947, and 1948 and stood ready to produce them at the hearing had he thought it necessary. We have heretofore found as a fact that adequate records were not maintained. Even were we to believe petitioner's allegation it would not change our decision on the above matters since, whatever the reason, the nonappearance of those records in evidence constitutes a failure of proof regarding the contents thereof and the facts such contents would tend to prove. Pennant Cafeteria Co., 5 B.T.A. 293; Aaron Samuelson, Exr., 10 B.T.A. 860; Burnet v. Houston, 283 U.S. 223, 228. The remaining question for consideration is whether respondent's determination of negligence penalties for 1946, 1947, and 1948 was proper. The burden *91 of proving that the imposition of those penalties is erroneous rests upon petitioner. J.T.S. Brown's Son Co., 10 T.C. 840; Gibbs & Hudson, Inc., 35 B.T.A. 205. Section 293 (a) of the Code provides for the assessing of a negligence penalty totaling five per cent of a deficiency if any part of the deficiency "is due to negligence, or intentional disregard of rules and regulations but without intent to defraud." We have found, as aforementioned, that petitioner failed to keep books and records adequate to substantiate his returns. That action was in "disregard" of Regulations 111, section 29.54-1, [11] and petitioner failed to introduce evidence indicating that the disregard was other than "intentional." Moreover it has been held that the negligence penalty is justified where items of obviously taxable income are excluded from a return without satisfactory explanation. Edmond A. Hughes, 27 B.T.A. 1022, affd. sub nom. Little v. Helvering, 75 Fed. (2d) 436 (C.A. 8); Thomas J. Avery, 11 B.T.A. 958; Louis Wald, 8 B.T.A. 1003. Petitioner here failed to include items of income totaling $25,000 in his returns for the years involved and, as we have found, gave no satisfactory or tenable *92 explanation therefor. Consequently, it is clear that respondent properly imposed the negligence penalties. We have found, as above stated, that respondent's deficiency determinations for 1947 and 1948, and the negligence penalties for those years are sustainable. However, the deficiency determination *93 for 1946 is excessive to the extent that it is based upon adjusted gross income greater than $7,968.77. Therefore, that deficiency, as well as the negligence penalty for 1946, must be recomputed. Decision will be entered under Rule 50. Footnotes
1. Includes only items subjected to change. 2. This is a mathematical error. The correct figure is $7,353.58. ↩ 5. This is a mathematical error. The correct figure is $34,458.62; the "Corrected adjusted gross income" should be $12,241.43; and the "Additional taxable income" should be $7,589.07.↩
3. Contains only the additions credited to the reserve since December 31, 1945. Those additions were for depreciation of automobiles and office equipment. ↩
4. Includes certain nondeductible expenditures for assets, such as real estate. Nondeductible expenditures paid in cash are not included because of inability to reasonably approximate them. ↩
6. I.R.C., section 117(a), (b), (j)↩. 7. I.R.C., section 112(b)(1)↩.
8. Internal Revenue Code. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *↩
9. I.R.C., section 117 (a), (b), (j)↩. 10. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b) Exchanges Solely in Kind. - (1) Property held for productive use or investment. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩
11. Sec. 29.54-1. Records and Income Tax Forms. - Every person subject to the tax, except persons whose gross income (1) consists solely of salary, wages, or similar compensation for personal services rendered, or (2) arises solely from the business of growing and selling products of the soil, shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of the gross income and the deductions, credits, and other matters required to be shown in any return under chapter 1. * * * The books or records required by this section shall be kept at all times available for inspection by internal-revenue officers, and shall be retained so long as the contents thereof may become material in the administration of any internal-revenue law.↩